Merrimack
No. 2009-345

THE STATE OF NEW HAMPSHIRE

v.

JEROME THOMPSON

Argued: June 17, 2010
Opinion Issued: February 25, 2011

*Michael A. Delaney*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Jerome Thompson, appeals his conviction by a jury of one count of aggravated felonious sexual assault. *See* RSA 632-A:2, II (2007). On appeal, he argues that the Superior Court (*Sullivan*, J.) erred by denying his motion to dismiss based upon the weight of the evidence and by admitting certain hearsay evidence. He also, for the first time on appeal, argues that we should reverse his conviction and grant him a new trial because his trial counsel was ineffective. While we have previously declined to review ineffective assistance of counsel claims on direct appeal, we hold, based upon the indisputable and egregious errors of trial counsel, which are

apparent from the trial record, that the defendant was provided ineffective assistance of counsel. Accordingly, we reverse and remand.

The record supports the following facts. Six-year-old D.K. lived in North Woodstock with her mother, her mother's boyfriend and her two younger siblings. During the weekend of October 5-7, 2007, D.K.'s father brought D.K. and her siblings to Concord to visit his cousin, Andrea Zbink, who lived with the defendant. At one point that weekend, D.K. spent approximately one hour sitting with Thompson at the computer desk in Thompson's and Zbink's bedroom.

D.K.'s father returned the children to their mother at the end of the weekend. On October 11, 2007, D.K. first told her babysitter, and then later that evening her mother, that the defendant had shown her pornographic movies on his computer. She also told the babysitter, but not her mother, that the defendant put his hand on her "private parts." D.K. later repeated these allegations during an interview at a Child Advocacy Center, which was observed by Detective Sean Dougherty of the Concord Police Department. During the trial, the only substantive evidence of the defendant's guilt consisted of unobjected-to hearsay testimony by the babysitter and the mother describing the statements D.K. made to them, and unobjected-to hearsay testimony by Dougherty regarding statements made by D.K. during her Child Advocacy Center interview. While at trial D.K. acknowledged that the defendant showed her movies that made her feel "icky," she denied that he had touched her.

The defendant argues that his trial counsel, who is not counsel on appeal, rendered ineffective assistance of counsel by: (1) failing to object to inadmissible hearsay; (2) failing to object during the State's closing argument when the State referenced evidence that had previously been ruled inadmissible; and (3) simultaneously representing the defendant's parents, whose interests conflicted with the defendant's interests. We set forth the testimony and facts from trial in significant detail to evaluate the basis for the defendant's claims.

The State used much of its opening statement to appeal to the emotions of the jury, and began by questioning how anyone could touch a small child for his own sexual gratification. The prosecutor emphasized to the jury that he could not explain to them

> why any human being would be so brazen and so bold as to touch a child for their sexual gratification, particularly an eight year old. Why anyone would violate the innocence of a child for that purpose is something that as human beings, you may grapple with to try to put your mind around, but you know, unfortunately, in this day and age . . . it happens. It's outrageous.

At times in your life you've heard maybe from a friend or family member about things like this that happened, or you've read in the paper stories, scout masters, clergy abusing students . . . . It happens. It's insidious and brazen in its nature.

What makes it so insidious and so brazen is that sometimes it can happen seemingly right under the eyes of the people who should be watching for that child's safety. That's the sort of case that you're going to be hearing about.

The prosecutor then continued by outlining some of the likely testimony from the State's witnesses. Specifically, he told the jury that they would "hear an eight-year-old girl talk to [them] about things no eight year old should ever see." He reminded them that the victim was "very shy," and implored them to have patience and to listen carefully to her testimony. He also told the jury to expect testimony from the babysitter, who would tell them "ever [sic] babysitter's nightmare, which is the child that you love and care for disclosing abuse," and the mother, who would disclose "what it's like to be the parent in every parent's nightmare . . . actually of learning that your child is the victim of sexual abuse." The prosecutor, however, made no mention of D.K.'s Child Advocacy Center interview. He concluded with another emotional plea:

When you see [D.K.] on the stand, you may wish for all — in all your heart that you could just turn back the clock to October 4, 2007 and tell her, don't go, but you can't do that. You can't do that. What you can do is believe her and hold that man accountable for what he did to her.

Defense counsel's opening statement responded by attacking D.K.'s credibility. He told the jury that D.K. had a difficult time dealing with her parents' divorce, which caused her emotional distress. He also explained that D.K. had recently told the prosecutor that none of the events she previously alleged had ever actually occurred. He concluded by telling the jury that "the adults that were there didn't see anything wrong. The evidence will show you that. It's only what [D.K.] said, and then she changed her mind."

Following opening statements, the State questioned its first witness, the babysitter, about the night that D.K. first disclosed the allegations:

Q. What did she tell you?

A. She started just telling me that she went to this — I don't know if it's a cousin or uncle, but house, and the guy's name was Jerome, and he would let her go into his bedroom but no one else

could ever go into it. So it kind of got me curious on why were you allowed to but not the other kids.

. . . .

Q. Was there a word or phrase she used about the bedroom?

A. She said she would go into his bedroom, and the door would get shut, and no one else was allowed in there.

Q. Did she refer to it as a particular place, private in some fashion?

A. Yeah. She just said no one could go in there.

. . . .

I asked her what was — you know, what happened, you know, what were you guys doing in the bedroom by yourself with the door shut, and she did tell me they were watching movies.

. . . .

Q. What happens next?

A. She — I asked her what kind of movies they were watching, and she was telling me she was watching adult movies with him.

Q. She didn't use that phrase, though?

A. No. She basically said that she was watching movies at — she was — movies that kids shouldn't be watching basically so that the other kids weren't allowed in the room at the time.

Q. How did she describe them to you?

A. She said they were naked and on the bed and things like that.

Q. And was there anything about — other things that she mentioned that made you realize what kind of movies they were?

A. . . . You know, she was — just when she said that there were — she was watching movies that people are naked and stuff like that kind of just threw me. Like I didn't know what to expect.

. . . .

Q. Did she say where she was in his bedroom when she was being shown these movies?

A. I think she said she was on the bed.

. . . .

Q. So what else do you remember her telling you?

A. She told me they were sitting on the bed together watching the movie and he placed his hand on her thigh, her inner thigh and gradually moved up towards her private parts.

Q. Did she use a word for private part?

A. She just said "my private parts."

. . . .

Q. So — and I hate to ask, but I have to be clear. She told you he ended up touching her where?

A. In her private spot.

. . . .

Q. I'm sorry, because we have to, in court, be clear, what was it that you believed — what was the subject of the conversation about private part?

A. I believed that it was her vagina.

Q. Aside from what she said, what helped you make that conclusion?

A. Because she was saying that he was rubbing the inner thigh of her leg and she said that "he touched my private parts."

Defense counsel did not object at any point during this testimony. On cross-examination, defense counsel again made reference to the babysitter's conversation with D.K., and she again testified that D.K. told her that the door to the defendant's bedroom was shut and that D.K. and the defendant sat on the bed together watching the movie.

The State next called D.K.'s mother, who also provided unobjected to testimony about her conversation with the babysitter when she returned home that evening:

Q. How did [the babysitter] come out and say she needed to talk with you about something?

A. Just kind of did. She just kind of said, you know "I need to talk you to [sic]. [D.K.] said something that is concerning, and I need to tell you about it."

. . . .

Q. What did she tell you?

A. She told me that [D.K.] told her that when she was at her cousin's house this weekend that she was sitting on Jerome's lap and he was trying to do things and watch movies with her.

Q. When — from what she was relating to you, did the movies — I mean, what kind are we talking about?

A. Yeah. She said bad movies.

Q. Do you remember her — other than bad movies —

A. [The babysitter] did not get into detail with me. I wanted to hear it directly from [D.K.], so I wasn't listening to one person and not the other.

The State then questioned the mother regarding her conversation with D.K. later that evening:

Q. Okay. So they had been put to bed, but they weren't like out yet.

. . . .

A. I had let them come out. I told [D.K.], you know, if she ever needed to talk to me, that I was there. I didn't tell her why I was saying that or anything, and she proceeded to tell me she had a secret but she was told not to tell. I said, "well, you know, sometimes if you want to tell secrets, you can, especially to your mom or somebody you trust." She then proceeded to tell me about what she wanted.

. . . .

Q. Okay. Well, what do you remember her telling you?

A. She told me that — first she started off really happy that she had been playing games on the computer with Jerome, and he let her sit on his lap, and then he would put on bad movies is what she called them, and then she proceeded to go into a little bit of detail with me, more like, you know, she saw the man put his peepee in her — in the woman's and she had to jump on top of him, and she went into details like that.

I asked her where everyone else was at this point in time. She said they were there, that the door was open, but that anytime anyone came near her that he would put a game on for her. Like a normal six year old, she went on a tangent about the game and how fun it was and everything.

Q. The [videogame], she talked about that for a minute?

A. Uh-huh. She said that he would — he told her that it was — that it was fun and that it felt good and that if he wanted to touch her, he could. If she wanted to touch him, she could.

Q. What else?

A. That he could touch her or she could touch him.

Q. Did she say if anything happened when she was on his lap?

A. She did not.

Again, defense counsel did not object to any of the mother's testimony. On cross-examination, defense counsel attempted to establish contradictions between the babysitter's and the mother's testimony, and the mother testified again that D.K. told her that she was in Thompson's room and

sitting on his lap. Defense counsel also questioned the mother as to why she waited six or seven days to call the police.

The State next called D.K. to testify. Her direct testimony covers more than forty pages in the trial transcript, but she did not testify, and in fact denied, that the defendant molested or otherwise touched her. The prosecutor asked D.K. numerous leading questions, and at some points asked her to write down her answers or draw pictures. He also frequently repeated and slightly rephrased questions in an effort to coax answers from D.K. Most of the questioning focused on what occurred in the defendant's bedroom:

> Q. Did you see something that made you go "ick"?
>
> A. I can't remember.
>
> . . . .
>
> Q. A while ago you and I had a chance to talk, and I think you said you were worried about people learning your — was it bees-baz? What's that word?
>
> A. Bees-baz.
>
> Q. Bees-baz? Okay. What's that word mean for you?
>
> A. I don't want them to know my business.
>
> . . . .
>
> Q. Okay. And you don't want people to know your bees-baz. I think you told me a minute ago, but I just — maybe I forgot, too. Why don't you want people to know your bees-baz[?]
>
> A. Because it's none of their business, and it's only mine.
>
> Q. It's only yours. It's okay sometimes to tell a little bit in a place like this because people know it's private, and they won't tell their friends. Okay? Is there some bees-baz from that time you were with [the defendant] that's hard to talk about[?]

At one point, the prosecutor asked D.K. to "write a little bit about the bees-baz that [she] didn't want people to know about." She wrote "the computer," and the State proceeded to ask several questions regarding a computer.

> Q. What — did you see something on the computer people shouldn't show kids?
>
> A. I think so.
>
> . . . .
>
> Q. Was it pictures on the computer of cars or people or buildings or something else?

A. I don't know.

. . . .

Q. . . . If nobody was here — if [D.K.] was just here by herself, if nobody had to hear your bees-baz about what it was that you saw that made you feel icky, like these people, if there was nobody here, if it was just us, just kind of like you're looking at me now and it was just us, what would [you tell] me about those people?

A. I think they were — I'm not quite sure, but I think they were naked.

. . . .

Q. . . . Why don't you just — can you close your eyes for me, please? I want you to think really hard about your classroom and think really hard about [your teacher]. I want you to just pretend I'm [your teacher], and I said, [D.K.], what's that bees-baz that you're really worried about? You can just tell us and nobody will get mad. It's okay. Go ahead.

A. People on the computer were naked.

. . . .

Q. How come they made you feel icky?

A. I'm not quite sure, but I think because they were naked.

. . . .

Q. Okay. Did you see the boy's private parts do some things to the girl's private part?

A. I don't know.

. . . .

Q. . . . Did you tell [the babysitter] about the naked people on the computer?

A. No.

The State then directly asked D.K. whether the defendant had touched her:

Q. . . . I'm just kind of wondering, did [Zbink's] boyfriend do something that you're afraid people will find out about?

A. No, he didn't do anything.

Q. I'm sorry? No? Is there something that happened in [Zbink's] bedroom that you don't want people to know about?

A. No.

Finally, when asked how she felt about having to answer the State's questions, she answered "nervous." Defense counsel did not cross-examine D.K.

The State then called Zbink, who lived with the defendant. She testified that she was present at all times that D.K. was left with the defendant and that the door to their bedroom was never closed. Following Zbink, the State called CPD Officer Daniel Reilly, who testified regarding his conversation with D.K.'s mother when she came to report the allegations:

Q. What did [the mother] tell you?

A. She told me something inappropriate happened to —

[Defense Counsel]: Objection. I object as to hearsay.

The court sustained this objection. However, several questions later, the State again questioned Reilly regarding the same conversation:

Q. Now, she identified who the subject of her concern was?

A. Correct.

Q. And her daughter?

A. Yes, her daughter [D.K.].

Q. And without getting into the particulars, in a very general sense what kind of concern did she convey to you?

A. Well, she told me that her daughter was a victim of a sexual assault.

Despite his earlier objection, defense counsel did not object to this testimony.

Reilly then testified regarding his initial investigation and first conversation with the defendant. The defendant told Reilly that D.K. was sitting on his knee playing hearts on the computer and watching YouTube videos, but he denied showing her pornography. Defense counsel did not cross-examine Reilly.

D.K.'s father next testified that he was in the family room at the time of the alleged assault but could not see the computer monitor from the family room and it would have been difficult to see anyone sitting at the computer. He also testified that he checked on D.K. every fifteen minutes and on each occasion found her sitting on the defendant's lap and playing a computer game. The State asked the father how he found out what had happened to D.K.:

Q. How was it that you found out something might have happened that weekend?

A. I believe I dropped my kids off, I believe it was Sunday, and it was later that week, I think, Thursday, or Friday my ex-wife called me and told me [D.K.] had told her.

[Defense Counsel]: Objection, Your Honor, hearsay.

The court sustained that objection. Defense counsel then briefly cross-examined the father regarding whether he could hear D.K. in the bedroom.

Finally, the State called Detective Dougherty, who testified about his investigation of the allegations. The questions focused on D.K.'s Child Advocacy Center interview, which Dougherty observed:

Q. Do you remember the things that [D.K.] said?

A. I do.

. . . .

Q. Was [D.K.] able to convey to the interviewer the things that were the subject of that investigation?

A. Yes, she was.

Q. Did she talk about the computer?

A. She did.

Q. What do you recall about that?

A. I recall that she viewed a computer and was shown images that she described or indicated to me that they were pornographic in nature. Of course, she was using terms that an eight year old would use, but it led me to believe that what she was describing was sexually explicit material that she was shown on a computer.

Q. Did she say what else happened to her?

A. She indicated that she was seated with Jerome Thompson. She was at his residence in Concord and that he was originally playing video games and that's what led her to go look at this computer and that while she was watching him play computer games, at some point she climbed on . . . his lap and looked on the laptop screen and that while this was going on in between computer games is when the video clips would pop up that she described. She indicated that Mr. Thompson told her that this was something he and Andrea Zbink do.

[Defense Counsel]: Judge, I guess it's double hearsay at this point in time.

The Court: Say it again.

[Defense Counsel]: I say it's double hearsay at this point in time.

The Court: Say it again?

[Defense Counsel]: I say I believe this is double hearsay at this point in time.

The court again sustained the objection. However, the State then immediately continued with a similar line of questioning:

Q. Did the — did she talk about where the defendant's hand ended up?

A. Yes, she did.

Q. Did she use — what kind of word did she use to describe the part of her body that an eight year old would use?

A. I believe she referred to it as her pee-pee.

. . . .

Q. Okay. That's fine — did she say what part of the defendant's body contacted her pee-pee?

A. Yes, she said his hand.

Despite his earlier objection, defense counsel did not object to any of this subsequent testimony.

Dougherty then testified regarding his search for the defendant's computer. He testified that he first went to Zbink's home, but the computer was gone. Dougherty testified that as a result of his conversation with Zbink, he surmised that the defendant's parents had taken the computer. Accordingly, he obtained a warrant to search the parents' home and car. On November 10, when Dougherty attempted to execute the warrant, no one was home and the car was gone. After waiting for some time, Dougherty entered through an unlatched back door, but could not find the computer. He left a copy of the search warrant on the door and left the home.

Later that afternoon the defendant's father called Dougherty and was upset that the police searched his home without him being present. Dougherty testified that:

[The defendant's father] was basically stating who do you think you are, why did you search my house, and I was trying to tell him, "Look, we can talk about this, I'm more than happy to explain everything." He continued to yell. Finally he said, "Am I the subject of this investigation or am I or my wife the subject of this investigation." I said, "No, you're not and I would like to talk to you about that." I said, "I'm conducting an investigation in reference to Jerome Thompson." At that point he stated, "You're looking for the computer."

At this point, defense counsel again successfully objected on hearsay grounds. However, the State referenced this statement in its closing argument and defense counsel did not object.

Dougherty then testified that the defendant's father offered to bring the computer to the Pittsfield Police Department, but failed to do so and did not answer a later telephone call from Dougherty. Dougherty testified that later that same day while at the police station, he was notified that an attorney representing the defendant's parents, who was the same attorney who later represented the defendant at trial, was on the phone. Dougherty testified that the attorney "indicated that he understood that I was looking for a computer and that he was with his clients, the [defendant's parents], at his office and that based on what his clients had told him, the computer had been lost or destroyed." Dougherty continued that

> [i]n speaking with [the attorney] I explained where I was and what my intentions were. I wanted to talk to them. He indicated they were there at the time, that he wasn't going to let . . . them talk to me. I said, "Could I ask them some questions?" And he basically said, "You can ask. I don't know if I'm going to let them answer them."

When Dougherty arrived at defense counsel's office, a receptionist told him that the clients he was looking for had left. Defense counsel did not cross-examine Dougherty, call either of the defendant's parents to testify, or otherwise attempt to account for the computer's disappearance.

Following this testimony, the State rested and defense counsel moved to dismiss the indictment, arguing that the State had not presented any evidence of "inappropriate touching." The State responded that

> there is sufficient evidence to give this case to the jury, particularly I'd point out that there are a number of witnesses who have testified to what [D.K.] has disclosed, in particular, [the babysitter] talked about this, of course, the exposure to pornography on the computer but also in particular she talked about disclosing how the defendant touched her private with his hand while she was on the computer. *That came in without objection.* That is a — that is evidence.
>
> Similar testimony came in with regard to [the mother]. I won't go into it in great detail, and similar came in with Detective Dougherty.
>
> With regard to the young girl herself, she clearly talked about something in the defendant's bedroom that made her icky and sick. She talked about seeing something on the computer which involved two grownups that she believed were naked. She

struggled in terms of memory, but I think that that only supports the belief that those *unobjected to statements are admissible.*

Even if they had been objected to I would for the record like to note that I think [I could] make a pretty good argument under two rules of evidence that they would have been otherwise admissible, particularly I'd argue that under 803 they are prior recorded recollections and under 804 they are also under the catchall, statements indicative of general reliability and — that are necessary because they are material to the . . . elements of the offense and clearly the best evidence that covers this area.

. . . .

So there are a variety of reasons which I think would allow for the admissibility of the statements from those other witnesses, even if they had been objected to, *but the fact of the matter is they weren't.* I believe they can be taken by the jury as substantive evidence at this point and would be sufficient to show that the defendant touched that private, which we all know to be the genitalia of a child under the age of 13 and given the circumstances, a reasonable juror could believe it is for the purpose of sexual arousal or gratification.

(Emphases added.)

Defense counsel responded that the mother and babysitter "had significant conflicts in their testimony relative to what the child allegedly told them," and that it "certainly would go to the weight, if not even to the admissibility." The court noted that its job is not to weigh the evidence and denied the motion. It found that the witnesses' testimony "came in without objection and it was very specific." The court continued:

It came in through at least three witnesses, maybe four. There was, for the first time, an objection after lunch on the basis of hearsay, which I sustained, and then [the State] went on and asked some other questions that went right to that touching and right to what the allegation was, *and the objection was not raised again,* and the police officer testified to what the victim said. This is [what] Officer Sean Dougherty testified to what the victim said.

There was an objection earlier to — which I didn't catch first the word double hearsay, but I'm not sure that was double hearsay, *but it was hearsay* and I don't care if it's double. Hearsay

is hearsay, *and I excluded it*, but five minutes later we're back with other questions from the State regarding where the hands went and the whole bit. . . .

My understanding of the law, subject to someone showing me a case that's incorrect, is that *if hearsay comes in without objection, then it comes in substantively*, and it's only when hearsay is objected to that I would then give a limiting instruction if I admitted it for some purpose other than for the truth of the matter contained. . . .

Now . . . just to make it real clear and for the record make it clear, I'm not buying [the State's] 801 argument at all. I'm agreeing that you didn't get [a] chance to make those arguments, and the reason you didn't get a chance to make those arguments is there was no objection so you didn't have to make them. It came in without objection. That's — just so everyone understands my ruling, I'm not going where [the State] went, and the reason I'm not going where [the State] went is . . . because there wasn't . . . an objection.

(Emphases added.)

The defense then rested without calling any witnesses. During his closing argument, defense counsel emphasized that D.K. told slightly different variations of the events to her babysitter and her mother, and then completely denied the allegations on the stand. He noted that while the babysitter testified that D.K. told her she was on the bed with the defendant and the bedroom door was closed, the mother testified that D.K. told her that the bedroom door was open and that other people continually entered the bedroom. He pointed out that the babysitter testified that the children were sleeping when the mother arrived home on the night that D.K. disclosed the allegations, while the mother testified the children were in bed, but awake. He also emphasized that the mother waited six days after becoming aware of the allegations to report them to the police. Defense counsel concluded by telling the jury that just before the trial D.K. told the prosecutor none of the events that she had previously alleged had actually occurred. The State, however, objected because the defendant had not presented any evidence regarding this pretrial recantation.

The State's closing relied heavily on the unobjected-to hearsay testimony of the babysitter, the mother and Dougherty:

[The babysitter] told you how it came up in conversation as [D.K.] was sitting there and swinging her little legs and talking

about how she ended up in the defendant's bedroom and that she saw some things on the computer, and [the babysitter] knew. The hairs on [the babysitter's] neck must have stood up, just as yours probably did when you listened to [D.K.] about the bees-baz.

[The babysitter] knew that that child had been exposed to pornography on that computer, and [the babysitter] told you how that little girl also told [her] how the defendant touched her, how he put his hand on her thigh, reaching up to touch her private, which, of course, we all know is her vagina, and he touched her . . . .

Again, you heard [the mother's] testimony about the beesbaz, about what happened, about what she saw, and about what happened to her.

. . . .

. . . [D]etective [Dougherty] told you how the child disclosed being exposed to pornography on that computer. . . .

. . . .

He also told you how [D.K.] talked about being touched on her private by the defendant with his hand. So [D.K.] tells you as best she can, as best any eight-year-old perhaps could, but you know from what you saw what happened to her. And you know from what everyone else who spoke with her and told you about what she said — you know what happened to her.

The State also discussed Detective Dougherty's search for the missing computer and disparaged the conduct of the defendant's attorney:

[T]here's a call from an attorney saying, oh, well, it's gone, lost, destroyed days, soon after — just after the father said he'd give it over. The attorney, no, it's lost or destroyed.

The detective goes to try and talk to that attorney, the very attorney who was standing in front of you just a few minutes ago . . . .

The jury subsequently convicted the defendant and the defendant appealed.

We initially declined to hear his ineffective assistance of counsel claim on direct appeal because we have previously indicated that such a claim should be adjudicated in the superior court by collateral review, and should not be prematurely merged with a defendant's other claims on direct appeal. *State v. Veale*, 154 N.H. 730, 736 (2007). However, the defendant argued in his motion for reconsideration that this case presented an exception to the general rule and that no collateral proceeding was necessary. We granted that motion and allowed him to add the issue to his notice of appeal.

In *Veale*, we discussed the proper procedural posture for an ineffective assistance claim, but did so in an entirely different factual context. In that case, the *pro se* defendant raised an ineffective assistance claim on direct appeal against his trial counsel, who was a public defender. *Id.* at 731. The defendant's appointed appellate defender subsequently moved to withdraw due to a conflict of interest. *Id.* To avoid such a conflict of interest, we held that when a defendant raises a claim of ineffective assistance against a public defender and the appellate defender is appointed as appellate counsel, the appeal will be automatically stayed. *Id.* at 736. Following the imposition of this stay, the defendant can then litigate his ineffective assistance claim on its merits in superior court. *Id.* We noted that this approach would allow an ineffective assistance claim to "maintain its proper place as a method of collateral review," rather than being prematurely merged with a defendant's claims on direct appeal. *Id.*

■ While we again recently indicated a preference for collaterally reviewing ineffective assistance claims, *see State v. Kinne*, 161 N.H. 41 (2010), we are now persuaded, in agreement with numerous other state appellate courts, that direct review of such a claim may be permitted in certain, limited circumstances where all of the facts necessary to adjudicate the claim appear in the trial record. *See, e.g., Woods v. State*, 701 N.E.2d 1208, 1211 (Ind. 1998), *cert. denied*, 528 U.S. 861 (1999); *Com. v. Adamides*, 639 N.E.2d 1092, 1096 (Mass. App. Ct. 1994); *State v. Bacon*, 658 A.2d 54, 66 (Vt.), *cert. denied*, 516 U.S. 837 (1995). While the State does not argue that we should decline to accept the defendant's ineffective assistance claim on direct appeal, we nonetheless lay out the reasoning for this approach because we are permitting a new procedure.

In *Woods*, the Supreme Court of Indiana articulated a preference for adjudicating ineffectiveness claims in collateral proceedings, but held that a defendant could choose whether to bring such a claim on direct appeal or in a collateral proceeding. *Woods*, 701 N.E.2d at 1219-20. In reaching this result, the *Woods* court began with a review of the procedural approaches adopted by other jurisdictions for adjudicating ineffective assistance claims. The court explained that these approaches can generally be broken

down into three categories: (1) jurisdictions that require litigants to raise ineffective assistance claims on direct appeal or risk losing the claim in a subsequent collateral proceeding; (2) jurisdictions that prohibit ineffective assistance claims from being reviewed on direct appeal under any circumstances; and (3) jurisdictions that permit the consideration of ineffectiveness claims on direct appeal, but only when all the facts necessary to decide the claim appear in the trial record. *Id.* at 1216-20.

The first approach, which requires defendants to either bring an ineffectiveness claim on direct appeal or forfeit it forever, appears to be followed by only a few states and has been repeatedly criticized by the United States Court of Appeals for the Tenth Circuit. *See generally id.* at 1218 n.15 (explaining the ongoing debate between Oklahoma's appellate courts and the Tenth Circuit regarding Oklahoma's procedural default rules, which require a litigant to bring an ineffective assistance claim on direct appeal or risk forfeiting the claim). This approach does not take into account the state of the trial record and is problematic because in most cases a factual record must be developed by the trial court in order to ensure effective review. *Id.* at 1216. This approach forces appellate counsel to choose between the difficult and risky route of attempting to litigate an ineffectiveness claim on direct appeal or waiting for a collateral proceeding and risking forfeiture. *Id.* at 1216-17.

The second approach, which lies at the other end of the spectrum, prohibits ineffectiveness claims on direct appeal under any circumstances and requires a defendant to litigate such a claim in a collateral proceeding. *See, e.g., State v. Nichols*, 698 A.2d 521, 522 (Me. 1997) (overruling previous decision that reserved the possibility of considering an ineffectiveness claim on direct appeal if counsel's incompetence was clear from the record); *State v. Levitt*, 371 A.2d 596, 600 (R.I. 1977) (declining to review any alleged error on direct appeal that was not a specific decision of the trial court); *Jackson v. State*, 654 A.2d 829, 832 (Del. 1995) (defendant must await finality of affirmed conviction prior to asserting collateral claims); *Gibson v. State*, 351 So. 2d 948, 950 (Fla. 1977) (declining to address ineffectiveness claim on direct appeal unless the alleged incompetence reduced the trial to "a mockery or a sham"), *cert. denied*, 435 U.S. 1004 (1978). In *Nichols*, the Supreme Judicial Court of Maine relied on a number of pragmatic considerations in declining to address ineffective assistance claims on direct appeal. *Nichols*, 698 A.2d at 522. The court worried that doing so would deprive the State of the benefit of an evidentiary hearing, place an appellate court in the role of factfinder, encourage a defendant to seek different counsel for the purpose of raising an ineffectiveness claim on direct appeal, and constitute a significant drain on judicial resources. *Id.*

While we agree with much of the court's reasoning in *Nichols*, a blanket prohibition on reviewing ineffectiveness claims on direct appeal also has numerous shortcomings. First, there is no right to counsel in a collateral proceeding and litigants are often left to investigate and supplement the trial record without the assistance of legal counsel. *See State v. Lopez*, 156 N.H. 193, 199-200 (2007); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *see also* Primus, *Structural Reform in Criminal Defense: Relocating Ineffective Assistance of Counsel Claims*, 92 CORNELL L. REV. 679, 692-93 (2007). Additionally, the defendant may have served his full sentence prior to reaching the collateral review stage, lessening the incentive to challenge his conviction. Primus, *supra* at 693. Finally, by the time a collateral proceeding takes place, witnesses may disappear or their memories might fade, causing practical problems for the State in the case of a retrial. *Id.* at 695-96. With these shortcomings in mind, we see no reason to delay the vindication of important constitutional rights when an attorney's incompetence is clear from the trial record. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984) ("the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial"). Accordingly, to the extent our decision in *Veale* indicated that a defendant could never argue ineffectiveness on direct appeal, we now make clear that while a postconviction hearing is almost always the preferred procedure, we decline to adopt a rigid rule that completely precludes a defendant from arguing such a claim on direct appeal.

With this in mind, we turn to the third approach. This approach permits adjudication of an ineffectiveness claim on direct appeal only in the limited circumstance where all the facts necessary to decide the claim appear in the trial record. Because the state of the trial record is critical to this approach, we review the three most common forms of ineffectiveness claims, which are categorized according to whether the claim can be resolved based upon the trial record.

■ The first type — and the one the defendant alleges is present in this case — is a claim that can be evaluated on the face of the trial record. *Woods*, 701 N.E.2d at 1211. Examples include the failure to object to an instruction or failure to object to inadmissible evidence "where the failure is outside the range of reasonable professional judgment and its prejudicial effect is clear." *Id.* In these cases, "there may be no need for delay or the taking of extrinsic evidence . . . because the claim may be resolved from the face of the trial record. If so, the interest of prompt resolution of the matter favors permitting it to be raised on direct appeal." *Id.*

■ The second, and more common, type of claim involves issues that are "not visible at all on the trial record, or that require additional record

development to assess either the competence of the attorney or the prejudice resulting from the claimed error." *Id.* at 1212. These claims often require an investigation of facts beyond the record and are properly adjudicated as a method of collateral review in the superior court. Examples include the failure to pursue a factual defense, such as an alibi or insanity, or an undisclosed conflict of interest. *Id.*

■ The final, and most complicated, ineffective assistance claim is one based upon action taken on the record, but which requires a showing to rebut the presumption of counsel's competence. *Id.*

> An example of such a "hybrid" contention is an act or omission on the record that is perhaps within the range of acceptable tactical choices counsel might have made, but in the particular instance is claimed to be made due to unacceptable ignorance of the law or some other egregious failure rising to the level of deficient attorney performance.

*Id.* In such a case, while the reasoning of trial counsel may be apparent from the trial record, it is usually necessary to develop an additional record to show the reason for the act or omission that appears in the trial record. *Id.* at 1212-13.

■ We agree with the Supreme Court of Indiana that because it "can take myriad forms, ineffective assistance of trial counsel eludes once-and-for-all disposition." *Id.* at 1213 (quotation omitted). In the large majority of cases — those falling into the second and third categories that we just described — the record on direct appeal is insufficient to fully evaluate the merits of a defendant's claim. In these cases, a "factual record must be developed in and addressed by the trial court in the first instance for effective review." *Id.* at 1216 (quotation and brackets omitted). However, "[i]f we are dealing with an improperly incarcerated defendant, the cause of justice is plainly better served" by reviewing the defendant's claim as soon as possible. *Id.* at 1219. Therefore, while we maintain a strong preference for collateral review of ineffectiveness claims, we now hold that in the extraordinary case where "the factual basis of the claim appears indisputably on the trial record," direct appellate review is permissible. *Adamides*, 639 N.E.2d at 1096.

■ Our decision today provides the defendant with the choice of whether to raise an ineffectiveness claim on direct appeal or in a later collateral proceeding. However, we again emphasize that we strongly disfavor adjudication on direct appeal, and claims that cannot be decided on the trial record alone will be dismissed without prejudice or remanded for appropriate collateral proceedings. *Cf. Com. v. Cosme*, 499 N.E.2d 1203, 1204

(Mass. 1986) (remanding ineffectiveness claim where it could not be decided on trial record). Additionally, the defendant may request that the court stay his appeal and then raise his ineffectiveness claim before the trial court prior to proceeding with the rest of his appeal. *Cf. Veale*, 154 N.H. at 736. Indeed, because of the difficulties already noted with raising an ineffectiveness claim based upon the trial record alone, raising a claim without a postconviction hearing might serve to disadvantage the defendant. *See United States v. Taglia*, 922 F.2d 413, 417-18 (7th Cir.) (expressing a strong presumption in favor of trial counsel's competence when ineffectiveness claim is based solely on trial record), *cert. denied*, 500 U.S. 927 (1991); *Com. v. Peloquin*, 770 N.E.2d 440, 446 n.5 (Mass. 2002) ("an ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight"). Finally, under no circumstance shall the failure to bring an ineffectiveness claim on direct appeal result in the procedural default of that claim.

■ We turn now to the merits. The defendant's claim of ineffective assistance of counsel rests upon Part I, Article 15 of the State Constitution and the Sixth and Fourteenth Amendments to the Federal Constitution. We first examine the constitutional competency of counsel's performance under the State Constitution, and rely upon federal case law only for guidance. *State v. Brown*, 160 N.H. 408, 412 (2010). The State and Federal Constitutions "guarantee a criminal defendant reasonably competent assistance of counsel." *Id.* (quotation omitted); *see also Strickland*, 466 U.S. at 686. To prevail upon such a claim, a defendant must show, "first, that counsel's representation was constitutionally deficient and, second, that counsel's deficient performance actually prejudiced the outcome of the case." *Brown*, 160 N.H. at 412 (quotation omitted). To meet the first prong of this test, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To meet the second prong, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The defendant argues that defense counsel rendered ineffective assistance of counsel in two respects. First, he asserts that defense counsel's representation was constitutionally defective because he repeatedly failed to object to hearsay testimony that supplied "the foundation essential to the State's *prima facie* case," and because he failed to object during the State's

closing argument when the State referenced evidence that had previously been ruled inadmissible. Second, he contends that defense counsel had a conflict of interest sufficient to warrant his disqualification. We address only the defendant's "performance ineffectiveness" claims because his "conflict ineffectiveness" claim is not indisputably clear from the record and is thus inappropriate for direct appellate review. *See Woods*, 701 N.E.2d at 1212 (explaining that claims of undisclosed conflicts of interest require factual investigation beyond the record).

We begin with the defendant's claim that defense counsel allowed inadmissible hearsay into evidence and whether this constituted deficient performance under the first prong of the *Strickland* test. This turns upon a determination of whether "counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. To meet this prong of the test, the defendant must show that counsel made such egregious errors that he failed to function as the counsel the State Constitution guarantees. *State v. Kepple*, 155 N.H. 267, 270 (2007). We afford a high degree of deference to the strategic decisions of trial counsel, bearing in mind the limitless variety of strategic and tactical decisions that counsel must make. *Id.* The defendant must overcome the presumption that trial counsel reasonably adopted his trial strategy. *Id.* Accordingly, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

The defendant specifically cites as error counsel's failure to object to the hearsay testimony of the babysitter, mother and Dougherty, all of whom testified regarding out-of-court statements D.K. made about the alleged assault. He argues that no strategic reason could motivate defense counsel's failure to object because without the evidence, the State could not have proven its *prima facie* case. The State contends that the disputed evidence was admissible under an exception to the hearsay rule, and that defense counsel's decision not to object was part of "a reasonably adopted trial strategy," which we should not question with the benefit of hindsight.

Despite the high degree of deference we must afford defense counsel, the series of erratic and inconsistent decisions made by the defendant's attorney in this case clearly fall below the constitutional bar. We recognize that "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel therefore use objections in a tactical manner." *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006). Accordingly, while a single failure to object is unlikely to amount to constitutional error, defense

counsel's pervasive failure to object to the only substantive evidence of the defendant's guilt "cannot reasonably have been said to have been part of a trial strategy or tactical choice." *Id.*

Nonetheless, the State contends that defense counsel's trial strategy was to establish the inconsistencies of D.K.'s statements to the babysitter and mother. Additionally, the State points out that defense counsel knew that D.K. recanted days before the trial and intended to use the fact that she changed her story to damage her credibility.

While defense counsel did point out some inconsistencies between the babysitter's and mother's testimony, his failure to object allowed a legally insufficient case to go to the jury. He allowed the State's first two witnesses, the babysitter and mother, to testify without objection and in great detail regarding the hearsay statements D.K. made to them about the alleged assault. The babysitter, in particular, testified that D.K. had told her that the defendant touched D.K. in her "private spot."

D.K. then testified and denied that the defendant had assaulted her, after which defense counsel successfully objected to hearsay four times during the testimony of the State's remaining witnesses. During the testimony of one of those witnesses, Dougherty, defense counsel allowed Dougherty to testify at some length about D.K.'s statements prior to objecting. However, following his successful objection, he allowed the State to continue questioning Dougherty about D.K.'s statements. In his subsequent testimony, Dougherty stated that D.K. had told the interviewer that the defendant's hand touched her "pee-pee." This pattern of representation can at best be characterized as imprudent, and more accurately, completely irrational. Such conduct can only be attributed to a lack of understanding of the rules of evidence or extreme carelessness.

██ Accordingly, defense counsel's failure to object defies all rational explanation and is not protected as trial strategy. Even if the counsel's strategy was to point out inconsistencies between the State's witnesses, as the State suggests, the strategy was "manifestly unreasonable." *See Com. v. Whyte,* 684 N.E.2d 625, 626 (Mass. App. Ct. 1997) (defense counsel's decision not to object to hearsay testimony which allowed the State to prove constructive possession of cocaine was manifestly unreasonable and unprotected as trial strategy); *Castillo v. Matesanz,* 348 F.3d 1, 14 (1st Cir. 2003) (approving of the "manifestly unreasonable" standard used by Massachusetts courts for evaluating the strategic choices of defense counsel because it is not "opposite in character or nature," or "mutually opposed" to *Strickland* (quotations omitted)), *cert. denied,* 543 U.S. 822 (2004).

Moreover, defense counsel knew that D.K. had recently recanted her allegations. Indeed, he told the jury during his opening statement that "an

amazing thing happened in this case. Within the last few days I found out that [D.K.] told the . . . assistant county attorney that this never happened. It never happened. She didn't do anything, he didn't do anything." Defense counsel again attempted to make use of D.K's recantation during his closing argument, but the State objected. With this knowledge, defense counsel easily could have concluded that objecting to the inadmissible testimony likely would have precluded the admission of the only substantive evidence of his client's guilt and led to the dismissal of the charges against the defendant.

Even if defense counsel remained unsure whether D.K. would implicate the defendant on the stand, his actions following D.K's testimony were particularly unreasonable and illogical. Defense counsel successfully objected to inadmissible testimony of two witnesses, only to allow both witnesses to continue providing inadmissible testimony without further objection. During the testimony of Reilly, the State asked him what the mother told him when she came to report the assault and defense counsel successfully objected. Reilly then testified, without objection, that the mother told him that her daughter was a victim of sexual assault. Most egregiously, he allowed Dougherty to testify that D.K. stated that the defendant placed his hand on her "pee-pee" one question after successfully objecting to Dougherty's similar testimony. This was the only substantive evidence of the defendant's guilt other than the babysitter's testimony, and defense counsel's actions had no rational basis and were contrary to any reasonable trial strategy.

Additionally, as the defendant now points out, part of defense counsel's so-called trial strategy was to move for dismissal at the close of the State's case because the State had not "made a *prima facie* case." The State responded that a number of witnesses, in particular the babysitter and Dougherty, had testified to what D.K. disclosed and the testimony was admitted without objection. In denying the motion to dismiss, the court relied exclusively upon this hearsay testimony. The court noted that the witnesses' testimony "came in without objection," and that when defense counsel did successfully object, the State continued along a similar line of questioning to which defense counsel did not object. Therefore, defense counsel's failure to object was "manifestly unreasonable" and was not based upon any coherent trial strategy. *Whyte*, 684 N.E.2d at 626 (quotation omitted).

██ The State argued at trial, and now on appeal, that even if defense counsel had objected, the testimony was likely admissible under an exception to the hearsay rule. At trial, the State argued that, if objected to, the statements would have been admissible as either recorded recollec-

tions, *see* N.H. R. Ev. 803(5), or under the "catch-all" exception, *see* N.H. R. Ev. 804(b)(6). The State now appears to have abandoned those arguments, and contends that D.K.'s statements to the babysitter and mother are admissible as excited utterances. *See* N.H. R. Ev. 803(2). The State asserts that even though five days passed between the alleged assault and D.K.'s statements, the modern trend is to expand the time period following an exciting event for making an excited utterance when the declarant is a child. While the timing of the statement is only one factor to be considered, *State v. Pepin*, 156 N.H. 269, 274-75 (2007), the admissibility of statements made five days following a startling event runs directly contrary to our prior case law, *see State v. Woods*, 130 N.H. 721, 726 (1988) (statements made by seven-year-old child a day after an alleged sexual assault allowed "simply too much time for reflective thought").

██ Similarly, the State's argument that Dougherty's testimony was admissible as impeachment of the State's own witness by a prior inconsistent statement must also fail. Because of defense counsel's failure to object, the trial court admitted Dougherty's testimony for its full substantive force and the jury considered it as such. *See State v. Soldi*, 145 N.H. 571, 574 (2000) (explaining that a party can impeach its own witness with a prior inconsistent statement, but cannot do so under "the guise of impeachment for the *primary* purpose of placing before the jury otherwise inadmissible substantive evidence").

██ Turning now to the prejudice prong, the prejudice in this case is manifest. Counsel's conduct did not merely create a reasonable probability that, but for the failures to object, the result of the proceeding would have been different. *See State v. Whittaker*, 158 N.H. 762, 768 (2009). The inaction was so fundamental and flawed that the State was able to prove its case only because of defense counsel's failure, and the defendant was deprived of a fair trial. *See Whyte*, 684 N.E.2d at 626. In fact, counsel's deficient performance likely allowed the State's case to withstand a motion to dismiss. *Com. v. Boothby*, 834 N.E.2d 1202, 1204 (Mass. App. Ct. 2005). The trial court stated as much when it noted that when "hearsay comes in without objection, then it comes in substantively." In short, "trial counsel held, but never played, the highest trump." *Id.* (quotation omitted). Because the defendant prevails on his state claim, we need not reach the federal issues. *See State v. Ball*, 124 N.H. 226, 237 (1983).

We again emphasize that ineffectiveness claims are almost always to be resolved in the first instance by the trial court in a collateral proceeding. *Veale*, 154 N.H. at 736. However, in the rare case, such as the case at hand, where the basis for the ineffectiveness claim is unmistakably clear from the trial record, such a proceeding may be unnecessary. While we recognize

that defense counsel has never been given the opportunity to explain his decisions, his inconsistent and unexplainable pattern of representation throughout the trial demonstrates that the defendant received constitutionally defective assistance of counsel. Therefore, we reverse and remand.

Because we reverse Thompson's conviction upon his claim of ineffective assistance of counsel for failing to object to inadmissible hearsay, we need not consider whether counsel should have objected to the State's closing argument. Additionally, we do not reach the defendant's arguments that the trial court erred in admitting certain hearsay statements or that the verdict convicting Thompson ran against the weight of the evidence.

*Reversed and remanded.*

DALIANIS, C.J., and HICKS, J., concurred.