Rockingham
Nos. 2008-197
    2009-181

THE STATE OF NEW HAMPSHIRE

v.

MICHAEL BROWN

Argued: February 17, 2010
Opinion Issued: June 30, 2010

*Michael A. Delaney*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*Getman, Schulthess & Steere, P.A.*, of Bedford (*Andrew R. Schulman* on the brief and orally), for the defendant.

HICKS, J. The defendant, Michael Brown, was convicted of attempted first degree murder, *see* RSA 629:1 (2007); RSA 630:1-a (2007), and witness tampering, *see* RSA 641:5 (2007). He contends that the Superior Court (*Nadeau*, J.) erred by denying his motion for a new trial based upon a claim of ineffective assistance of counsel. We affirm.

The jury could have found the following facts. The defendant, a middle-aged man, began a relationship with the victim in either 2004 or 2005, when she was fifteen years old. On her sixteenth birthday, he gave her a ring and they discussed the possibility of marrying after the victim turned eighteen. In August 2006, the victim sought to end the relationship. Frustrated that the victim had not returned his telephone calls, the defendant confronted her at her workplace on August 11, 2006. That evening, the defendant called the victim to tell her that he was coming to her house to reclaim the ring. She met him in the driveway, climbed into his truck, and they drove away. Once in the truck, the defendant demanded that she return the ring. There ensued a heated discussion about their relationship. The victim testified that the defendant called her a "cheater" and told her how much he loved her. The victim stated she then told the defendant she "hated him" and to leave her alone.

At some point during this argument, the defendant parked in a residential section of Manchester. The victim told the defendant again that she hated him and asked him to leave her alone. In response, the victim testified that the defendant put his hands around her neck and began to choke her. She struggled and eventually kicked the truck's horn with her foot. The defendant then released her and drove away. In the struggle, the victim's necklace broke. The police recovered the broken necklace from the side of the road where the victim stated the defendant parked.

Also, while the vehicle was stopped, the defendant grabbed the victim's mother's cell phone, which she had in her possession, and snapped it into two pieces. The police later recovered the broken phone from the defendant. The victim's mother's boyfriend testified at trial that he had called the cell phone that evening and heard a female voice state, "[Y]ou're going to

kill me, you're going to kill me." A male voice then responded, "[Y]ou cheated on me . . . and I'm going to kill you," to which a female voice replied, "Mike, stop, Mike, stop."

The victim testified that when the defendant drove away, she was pinned between the seats in the vehicle. As they approached the highway, the defendant released the victim and said, "I want you to see this coming at you," apparently insinuating her impending death. The defendant drove erratically, swerving through traffic, and swiping a reflector pole. Police later found damage to the truck consistent with hitting a reflector pole.

The defendant eventually stopped on a long, isolated dirt driveway in Auburn. The victim told the defendant that "he was going to go to jail," to which the defendant replied, "[W]ell, then I guess there's no reason not to kill you" — a statement he subsequently denied. The defendant then began to strangle her again. She testified that she could not breathe or speak and that she almost slipped into unconsciousness, but that a "rush of adrenaline" gave her the strength to fight by hitting, scratching, and slapping the defendant. At that point, "he just stopped," according to the victim. And "[a]s soon as he let her go," the victim vomited. The police found vomit in the back of the truck.

Once free, the victim grabbed an orange cord from the backseat, wrapped it around the defendant's neck, and pulled. She stopped strangling the defendant when he started "convulsing almost." The defendant then apologized and asked the victim not to call the police. The victim agreed and stated she would go along with whatever story he concocted, whereupon the defendant drove her home. However, when she arrived home, she promptly called the police. The police later arrested the defendant.

During a post-arrest interview, the defendant admitted that he had choked the victim but stopped when he realized what he was doing. Specifically, the defendant stated, "[A]t one point I — I choked her. Did I choke her to kill her? I was angry. . . . [W]hen I choked her, I realized what I was doing and I felt like I couldn't." The following exchange also occurred:

[Detective]: So you tried to kill her, Mike.

[Defendant]: Tried to choke her, yeah. Did I try´to kill her? No. But I don't — I don't — I don't believe that I could — I — I couldn't kill her. I couldn't — when I was in the military I couldn't kill. That's why I got out.

[Detective]: That's where the trying part comes in, Mike. You tried, you couldn't, you stopped. That's —

[Defendant]: I tried, I couldn't, I stopped.

At other points during the interview, the defendant was less sure of his actions. When the interviewing detective declared, "You just tried to kill her," the defendant answered, "Trust me, I know, and I feel like s--t, all right? I don't need you to keep pounding it into me." The jury watched this interview at trial.

After the jury returned a verdict of guilty, the defendant moved for a new trial. In his motion, he argued that his trial counsel was ineffective because he: (1) failed to request a jury instruction on voluntary renunciation; (2) failed to request a jury instruction on lesser included offenses; and (3) permitted the jury to learn of a prior arrest and prosecution for rape. The trial court denied the motion for a new trial and the defendant appealed.

■ On appeal, the defendant asserts that his counsel was constitutionally ineffective under the State and Federal Constitutions. Part I, Article 15 of the State Constitution and the Sixth and Fourteenth Amendments to the United States Constitution "guarantee a criminal defendant reasonably competent assistance of counsel." *State v. Sharkey*, 155 N.H. 638, 640 (2007); *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). We first address the defendant's claims of ineffective assistance of counsel under the State Constitution, citing federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

■ To prevail upon a claim of ineffective assistance of counsel, the defendant must demonstrate, "first, that counsel's representation was constitutionally deficient and, second, that counsel's deficient performance actually prejudiced the outcome of the case." *State v. McGurk*, 157 N.H. 765, 769 (2008) (quotation omitted). A failure to establish either prong requires a finding that counsel's performance was not constitutionally defective. *See State v. Kepple*, 155 N.H. 267, 270 (2007).

■■ To satisfy the first prong of the test, the performance prong, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *State v. Whittaker*, 158 N.H. 762, 768 (2009) (quotation omitted); *see Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("[T]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (quotation omitted)); *Strickland*, 466 U.S. at 688. We judge the reasonableness of counsel's conduct based upon the facts and circumstances of that particular case, viewed at the time of that conduct. *Strickland*, 466 U.S. at 690. As we have previously stated:

> Judicial scrutiny of counsel's performance must be highly deferential. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's chal-

lenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Whittaker*, 158 N.H. at 769 (quotations and citations omitted); *see Strickland*, 466 U.S. at 689. In other words, the defendant must "show that no competent lawyer" would have failed to request a jury instruction on voluntary renunciation or lesser included offenses or permitted the jury to hear of the defendant's prior prosecution for forcible rape. *Whittaker*, 158 N.H. at 769 (quotation omitted).

■ To satisfy the second prong, the prejudice prong, the defendant must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Whittaker*, 158 N.H. at 768 (quotation omitted); *see Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Sharkey*, 155 N.H. at 641. In making this determination, we consider "the totality of the evidence presented at trial." *Kepple*, 155 N.H. at 270.

Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact. *Whittaker*, 158 N.H. at 768. Therefore, we will not disturb the trial court's factual findings unless they are not supported by the evidence or are erroneous as a matter of law, and we review the ultimate determination of whether each prong is met *de novo. Id.*

I

The defendant first maintains that his counsel was ineffective for failing to request a jury instruction on voluntary renunciation. Voluntary renunciation is an affirmative defense to an attempt crime, including attempted first degree murder. *See* RSA 629:1, III (criminal attempt); RSA 630:1-a (first degree murder). To establish this affirmative defense, a defendant must prove by a preponderance of the evidence that he "voluntarily renounce[d] his criminal purpose by abandoning his effort to commit the crime or otherwise preventing its commission under circumstances manifesting a complete withdrawal of his criminal purpose." RSA 629:1, III(a); *see also State v. Jernigan*, 133 N.H. 396, 398-400 (1990). Moreover, the renunciation cannot be "substantially motivated by circumstances the defendant was not aware of at the inception of his conduct which increase

the probability of his detection or which make more difficult the commission of the crime." RSA 629:1, III(b). "Renunciation is not complete if the purpose is to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim." *Id.*

The defendant asserts that he proved "beyond all doubt at trial" that he abandoned his effort to commit the crime under circumstances manifesting a complete withdrawal of his criminal purpose. He also maintains that there was enough evidence that his abandonment "was not substantially motivated by (a) an increased risk of detection or (b) circumstances that made the crime more difficult" to have entitled him to a jury instruction on the issue *"had his lawyer requested one."* The defendant cites his interrogation statements, such as "All I knew is — all I remember is thinking to myself, what am I doing? And that's when I stopped" and the victim's testimony in support of his argument.

The State disagrees that the defendant was entitled to a jury instruction on voluntary renunciation. The State argues that "[i]t would be an absurd, illogical, and unjust result to allow a renunciation defense where a defendant has choked a victim in two different locations" and injured her. Therefore, the State contends that trial counsel was not ineffective for failing to ask for a jury instruction on voluntary renunciation. The State notes that Kansas, Montana, Tennessee, and Wyoming have refused to permit a renunciation defense where the defendant has injured or wounded the victim prior to his renunciation. *See State v. Mahoney,* 870 P.2d 65, 72 (Mont. 1994); *Ramirez v. State,* 739 P.2d 1214, 1216-17 (Wyo. 1987); *State v. Morfitt,* 956 P.2d 719, 728 (Kan. Ct. App. 1998); *State v. Jackson,* 946 S.W.2d 329, 335 (Tenn. Crim. App. 1996) (Smith, J., concurring).

For the purpose of this appeal, we will assume without deciding that the affirmative defense of voluntary renunciation was available to the defendant. Accordingly, we will focus our inquiry on whether trial counsel's failure to ask for a jury instruction on voluntary renunciation fell below an objective standard of reasonableness based upon the facts of this case viewed at the time of the conduct. *See Whittaker,* 158 N.H. at 768. At the hearing on the motion for new trial, trial counsel testified that he had considered a voluntary renunciation defense but rejected it without speaking to his client. He stated he did not pursue a voluntary renunciation defense because he believed that "it was going to be easier" to challenge the State's required proof of *mens rea,* that the defendant had the specific intent to commit murder, than to try to win on renunciation. Trial counsel explained:

> Well, you walk a tightrope with the jury [with a voluntary renunciation defense]. You have to say, well, here's what he was

intending to do, but then he withdrew from it before he actually did it. And to say that he intended to commit murder and then changed his mind in midstream I think was a dangerous road to go down where you're looking at the simple attempt. It became all or nothing.

■ Even assuming that trial counsel could have requested a voluntary renunciation instruction here, his failure to do so did not fall below an objective standard of reasonableness. *See Whittaker*, 158 N.H. at 768. Trial counsel made a strategic decision to challenge the attempted murder charge by arguing that the defendant did not possess the requisite *mens rea*. He acknowledged that the defendant assaulted the victim, but repeatedly argued that the State could not prove that the defendant had the intent to murder the victim. He fully pursued this strategy through his opening statement, cross-examination of the victim, and closing argument. For example, in his opening statement, trial counsel asked the jury, "[D]oes this rise to the level of someone actually having a conscious object to commit homicide or was this just somebody who was emotionally distraught, losing temporary control, and not causing any medical damage?" Later, he argued,

> [I]t was an assault and only an assault. He grabbed her and he stopped because he knew that he couldn't do it, didn't want to do it. [H]e was out of character for that brief period of time, . . . but it was not his specific intent to commit murder, because if it was, he probably would have done it and could have done it.

This was a tactical decision that fell within the wide range of reasonable professional assistance.

■ The defendant contends that it was unreasonable for trial counsel to not advance both a *mens rea* and voluntary renunciation defense. We, like other courts, are reluctant to deem trial counsel's performance deficient for pursuing one viable defense over another viable defense. *See, e.g., Pina v. Maloney*, 565 F.3d 48, 56 (1st Cir. 2009) ("Under these circumstances, counsel's decision to pursue a defense of misidentification, rather than an alibi defense, can only be viewed as a reasonable, tactical decision.").

Accordingly, trial counsel's representation was reasonably competent and did not violate the defendant's rights under the State Constitution.

## II

The defendant next asserts that trial counsel was ineffective because he did not request jury instructions on the offenses of attempted first degree

assault, second degree assault, and simple assault, and reckless conduct, which he contends are lesser included offenses. At the hearing on the defendant's motion for new trial, trial counsel testified that he wanted a lesser included instruction for attempted second degree assault or less but that the trial court then would have also given an attempted first degree assault instruction, which he did not want. He worried that his client was not "a sympathetic figure" and that the jury would view the defendant's "relationship with [the victim] as unhealthy, disturbing, if not illegal," and, therefore, "the jury, if they had any doubts at all, would leap at the opportunity to convict on attempted first degree assault or a first degree assault. And that would leave [the defendant], basically, in the same position he'd be if he was convicted of attempted murder." He noted that attempted first degree assault carries a possible sentence of seven and a half to fifteen years. *See* RSA 631:1 (2007); RSA 629:1. Trial counsel testified that he discussed this strategy with the defendant, who agreed with it. In sum, trial counsel, with the defendant's approval, pursued, as the State argues, "an all-or-nothing approach" that eliminated the possibility of a compromise verdict.

█Assuming without deciding that the potential alternative offenses are lesser included offenses, we agree that trial counsel's decision not to request jury instructions for attempted first degree, second degree, and simple assault as well as reckless conduct was a reasonable strategic decision. Trial counsel consulted with his client and they chose to pursue an all-or-nothing strategy, eliminating the possibility of a compromise verdict. *See* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION § 4-5.2 cmt. at 202 (3d ed. 1993) ("It is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury."); *see also United States v. Weaver*, 882 F.2d 1128, 1140 (7th Cir. 1987) (no ineffective assistance of counsel where defendant concurred in trial counsel's tactical decision after being fully informed of the reasonable options before him), *cert. denied*, 493 U.S. 968 (1989). Under this strategy, trial counsel could concede that the defendant was guilty of a lesser-included offense, but could argue that he was not guilty of the charged offense, attempted first degree murder. This was important in this case, in particular, because the defendant had admitted to having choked the victim. Trial counsel also feared that the jury would not consider his client a "sympathetic person" or his relationship with the victim as wholesome, and, therefore, might be inspired to convict him of attempted first degree assault if they did not find him guilty of attempted first degree murder.

Under these circumstances, an "all-or-nothing strategy" was intentionally chosen and not unreasonable. Indeed, courts have rejected the argument that trial counsel's failure to request lesser included offense instructions constituted deficient performance when it was a strategically made decision. *See, e.g., Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir.) (holding counsel's failure to request jury instruction on lesser included offense of manslaughter was permissible exercise of trial strategy during murder trial, where defendant's primary line of defense was that he did not shoot victim), *cert. denied*, 546 U.S. 1044 (2005); *Bashor v. Risley*, 730 F.2d 1228, 1240-41 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984); *Autrey v. State*, 700 N.E.2d 1140, 1142 (Ind. 1998) (concluding counsel not ineffective for pursuing an "all or nothing" trial strategy); *Simeon v. State*, 90 P.3d 181, 184-85 (Alaska Ct. App. 2004).

Therefore, we hold that trial counsel's performance did not fall below an objective standard of reasonableness.

## III

Third, the defendant contends that trial counsel was ineffective because he did not ask for the redaction of two portions of the defendant's recorded statement. During these segments, the jury heard the defendant discuss a prior arrest and prosecution for forcible rape, a charge of which he was acquitted. During this conversation, the interviewing officer also commented that "[r]ape seems to encircle you." According to the defendant, these discussions constituted impermissible character or propensity evidence that resulted in prejudice and undermined his defense strategy that the victim was lying about important facts, such as whether he ever threatened to kill her.

The State counters that trial counsel's failure to object to the admission of this evidence reflected trial strategy. Trial counsel wanted to show that the police "browbeat" the defendant causing him to become "emotionally distraught" — a strategic choice counsel regretted in hindsight. The State also argues that even if trial counsel's performance was constitutionally deficient, "[h]e cannot show that counsel's deficient performance caused prejudice."

■ We address first whether counsel's alleged error prejudiced the defendant's case. "In determining whether the defendant has established actual prejudice, we examine the totality of the evidence before the jury." *State v. Paulsen*, 143 N.H. 447, 456 (1999). If the defendant is unable to demonstrate such prejudice, we need not decide whether counsel's performance fell below the standard of reasonable competence. *State v. Breed*, 159 N.H. 61, 71 (2009); *see Strickland*, 466 U.S. at 697 ("If it is easier to dispose

of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

A review of the record reveals that trial counsel's failure to ask for a redaction of the defendant's statement could not have caused actual prejudice. *See Whittaker*, 158 N.H. at 768; *see also Strickland*, 466 U.S. at 693 (noting that "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding"; there is a "general requirement that the defendant affirmatively prove prejudice"). At trial, the jury heard the victim testify that the defendant choked her twice and that he threatened to kill her. The jury also listened to the defendant's confession, the testimony of investigating officers, and the testimony of the victim's mother's boyfriend, who called the victim's cell phone and heard a woman pleading for her life while a male voice threatened, "I'm going to kill you." Physical evidence, such as the broken cell phone, damage to the side of the truck, the victim's broken necklace, vomit in the back of the truck, and marks on the victim's neck, further corroborated her story. Therefore, even if trial counsel had successfully redacted the disputed portions of the defendant's videotaped interview, the defendant has not demonstrated that "the result of the proceeding would have been different." *See id.* at 694.

Because the standard for determining whether a defendant has received ineffective assistance of counsel is the same under both the State and Federal Constitutions, we reach the same result under the Federal Constitution as we do under the State Constitution. *Whittaker*, 158 N.H. at 768.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and CONBOY, JJ., concurred.