NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2017-0265


THE STATE OF NEW HAMPSHIRE

v.

OWEN LABRIE

Argued: November 28, 2018
Opinion Issued: June 7, 2019


Gordon J. MacDonald, attorney general (Sean R. Locke, assistant attorney general, on the brief and orally), for the State.


Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.


HANTZ MARCONI, J. The defendant, Owen Labrie, was convicted by a jury on three counts of sexual assault, see RSA 632-A:4, I(c) (2016), one count of endangering the welfare of a child, see RSA 639:3, I (2016), and one count of using computer services for a prohibited purpose, see RSA 649-B:4, I(a) (2016) (computer services use charge). State v. Labrie, 171 N.H. 475, 477 (2018). In the instant appeal, the defendant challenges an order of the Superior Court (Smukler, J.) denying his motion for a new trial based upon ineffective assistance of counsel as to the computer services use charge. We affirm.

I.  Pertinent Facts

        The facts underlying the defendant's convictions are fully set forth in
Labrie.  See id. at 478-81.  We repeat only those facts necessary to decide the
instant matter.  For the facts relevant to the defendant's motion for a new trial,
we rely upon the trial court's order denying that motion and the record
submitted in this appeal.

        A.  Facts Underlying the Defendant's Convictions

        In early 2014, the defendant was 18 years old and a senior at St. Paul's
School (SPS), a private coeducational boarding school in Concord.  Id. at 478.
At SPS, there was a prominent annual springtime tradition known as the
"senior salute," which involved a senior sending a note (or a senior salute) to a
younger student on campus, inviting that younger student to spend time with
the senior before he or she graduated.  Id.  Often, these notes had sexual
connotations.  Id.  Although a senior salute could be an invitation simply to
meet up with someone on campus, it was widely understood among SPS
students that physical contact, at least in the form of a kiss, was almost always
expected.  Id.  It was not unusual for the invitation to imply more advanced
sexual contact as well, including sexual intercourse.  Id.

        On May 28, the defendant sent the victim the following senior salute via
e-mail:

        [W]hile the thought of my name in your inbox makes me
blush perhaps more than it should, there's something [I] want to
share with you and my evenings left to do it are growing fewer by
the evening.  [T]here's a door here that's been locked since before
we were born, but in a moment of divine intervention the night
before last, its hinges swung open in my hands.  [I]f you want a
definition of the word bittersweet, think of me spending three years
trying to open it yet now only having three nights to remember the
view.  [I] want to invite you to come with me, to climb these hidden
steps, and to bask in the nicest view [M]illville has ever had to
offer.  [I] hope you're all right with heights.

        [I]f you're not otherwise engaged, mull it over.  [I] ask only
that you let me know soon--these days they're not making time
quite like they used to.

Id. at 479 (quotation omitted).  The victim replied to the defendant, stating:

        [W]hile the thought of your name in my inbox gives me a sense of
[déjà vu], ([my sister] and I are very close sisters,) and although I
would like to climb those hidden steps with you, I have to decline.

I would like to climb that, not the list of [freshmen] that have spent quality time with you.

Id. at 479-80 (quotation omitted). The defendant responded to the victim's e-mail, stating:

[P]robably one of the sassier emails [I]'ve ever received, my sweet lord. . . . [I]'m afraid that list is slimmer than you might think. [P]retty much nonexistent this term, even. [B]ut do as you please, [ma chère]. [I]'d have taken you either way.

Id. at 480 (quotation omitted). The defendant concluded his response with song lyrics in French, which translate as, "It's 2:45, . . . it's late and all the boys are dancing for you to console you, . . . their queen." Id. (quotation omitted).

Following this exchange, the defendant asked a freshman in his dormitory to put in a good word for him with the victim. Id. After speaking with the freshman, the victim e-mailed the defendant. Id. Translated from French, the e-mail stated, "It's true, . . . please forgive me. Yes, only if it's our little secret." Id. (quotation omitted). The defendant interpreted this to mean that the victim would meet him, but only if they kept it between themselves. Id. The defendant responded, "[W]hat a golden change of heart. [Y]ou've saved it until the very end — there's not a lot of time but [I]'m sure we can figure something out. [P.S.] [Y]our French is amazing. [N]ot a soul needs to know." Id. (quotation omitted). Subsequently, via Facebook Messenger, the two made a plan to meet. Id.

Before meeting the victim, as planned, on May 30, the defendant sent a message to an SPS alumnus that stated, "I'm slaying [the victim]." Id. at 480-81 (quotation omitted). Viewed in the light most favorable to the State, "slay" was a word regularly used by students at SPS to refer to sexual penetration, including digital penetration, oral sex, and sexual intercourse. Id. at 478 & n.1.

That evening, the victim met the defendant on campus, and the pair, at the defendant's suggestion, entered an SPS building. Id. at 481. The evidence, viewed in the light most favorable to the State, indicates that the defendant ultimately penetrated the victim digitally, with his tongue, and with his penis. Id. Viewed in the light most favorable to the State, the evidence establishes that on the evening of the encounter and throughout the weekend, the defendant told various SPS students that he had had sexual intercourse with the victim. Id. In a conversation with a friend, the friend asked, "How did it go from no to bone?," meaning how did it go from the victim declining the defendant's e-mail invitation to the victim and the defendant having sexual

3

intercourse.  Id. (quotation omitted).  The defendant responded that he "just pulled every trick in the book," including oral sex.  Id. (quotation omitted).

### B.  Jury Trial

The defendant's jury trial was in August 2015.  He was represented primarily by J.W. Carney, Jr. and Samir Zaganjori.  Because neither attorney is admitted to practice in New Hampshire, they retained local counsel, Jaye Rancourt.  Carney acted as lead counsel; Zaganjori acted as co-counsel; and Rancourt was available to consult with the rest of the trial team and to act as needed.

In addition to the felony computer services use charge, the defendant faced three counts of aggravated felonious sexual assault (AFSA), three counts of misdemeanor sexual assault, two counts of endangering the welfare of a child, and one count of misdemeanor simple assault.  One of the AFSA charges alleged that the defendant "utilize[d] the element of surprise" to cause penetration.  See RSA 632-A:2, I(i) (2016).  The remaining two AFSA charges alleged that he penetrated the victim when she indicated by speech and/or conduct that she did not freely consent to that penetration.  See RSA 632-A:2, I(m) (2016).  Six of the ten charges the defendant faced required the State to prove sexual penetration beyond a reasonable doubt.  After the close of the State's case, the trial court dismissed one of the endangering the welfare of a child charges.

In her opening statement, the prosecutor told the jury that the defendant raped the victim.  The prosecutor said that the evidence would show, beyond a reasonable doubt, that the defendant "penetrated [the victim] digitally, that he engaged in oral sex with her, that he penetrated her with his penis, [and] that she indicated by speech or her actions that her consent was not given, that this was against her will."  As to the computer services use charge, the prosecutor said:

> The evidence is going to show you that the Defendant utilized the email server and Facebook, social network, to entice [the victim] to solicit, lure, or entice her to meet with him with a plan that he was going to have sex with her.  And I encourage you to listen to that very carefully.

She told the jury that "[u]ltimately," the case came "down to one thing:  Do you believe [the victim]?  The State believes that you will."

In his opening statement, Carney began by telling the jury that if the jury had a reasonable doubt about the victim's testimony, "then the government hasn't proven its case."  He told the jury that the first issue for it to consider "is what does the evidence show about whether [the victim] was willing or

4

unwilling" during her encounter with the defendant. He suggested that the "best evidence" of whether the victim was a willing or unwilling participant was her "own words." Carney then quoted each of the electronic messages that the defendant and victim exchanged and invited the jury to infer that the victim's words in those messages were not the "the words of a rape victim."

Carney told the jury that the second issue for it to consider was whether there was "penetration of the vagina by . . . a penis or a finger or a tongue." Carney informed the jury that the phrase "senior salute" refers to a "range of activity," that the defendant denied to the police and would deny at trial that he ever penetrated the victim sexually, and that the evidence would show that the defendant and the victim, in fact, "never did have sex."

The victim was the first witness to testify. On cross-examination, Carney elicited the victim's admission that the phrase "senior salute" could mean "to just hang out with someone," and did not necessarily refer to having sex. The victim testified that, after she received the defendant's senior salute, she thought that he might want to kiss her, but that was "the extent [to which she] thought it would go." During his cross-examination of the victim, Carney reviewed with her the electronic messages that she and the defendant exchanged. Carney also asked the victim whether she had told her friend before meeting up with the defendant, "I'll probably let him finger me and . . . at most I'll blow him." The victim testified that she had "no recollection" of saying this.

On the fourth day of trial, several of the defendant's friends testified on behalf of the State. Defense counsel cross-examined several of those friends regarding the meaning of terms like "score," "hook up," and "slay," words that the defendant had used in electronic communications and conversations with his friends. Counsel elicited testimony that those terms did not necessarily refer to sexual intercourse.

In addition, the defense team elicited testimony from both the defendant's friends and the victim's friends that the term "senior salute" could be an invitation to engage in any number of activities from walking around campus to having sex. During his cross-examination of one of the defendant's friends, Zaganjori elicited testimony that the defendant never told that friend that he planned or expected to have sexual intercourse with the victim. During cross-examination, one of the victim's friends testified that, before meeting up with the defendant, the victim had said that she would probably let the defendant "finger her" and that "[a]t most," she would "blow him."

The defendant testified on the sixth day of trial. On direct examination, he testified that the word "slay" could refer to "walking around the lake," that the word "bone" could refer to "kissing," that the word "score" did not necessarily refer to engaging in physical activity with a member of the opposite

sex, and that the term "hook up" could refer to kissing or "dry-humping." The defendant testified that he sent a senior salute to the victim because he "wanted to ask her out." His plan, he said, was to take her to the chapel tower. During his direct examination of the defendant, Carney reviewed with the defendant the electronic messages that he and the victim had exchanged. In testifying about the encounter with the victim, the defendant denied ever putting his fingers, tongue, or penis under the victim's underwear. He testified that it had not "been [his] intention going into the night to have sex with [the victim]."

In his closing argument, Carney again focused upon the electronic messages that the defendant and the victim exchanged. He told the jury:

> Now one of the most important piece[s] of evidence of all is what the e-mails and chats were between [the victim] and [the defendant]. In particular, the ones after they got together, not just in the next hour, not through the remainder of the day, not into the next day, into the next week between the two of them. Please read those e-mails and chats and decide is this someone who was unwilling in what happened in the attic. Was this the conversations at [the victim's] end by a rape victim, because that's what the government says she was, as soon as she left the Lindsey Building, she was a rape victim. That's the government's view.

> Take a look at what was said before there was any prosecution, see the words [the victim] used. I'll read some of [the victim's] lines. You will be able to put them in context. You will be able to see where in the conversation they fit, but when I talk about someone who is the victim of a violent sexual assault, that as the Prosecutor described in her opening, would that person [m]ake the following responses to her rapist?

> [The defendant] that said "You're an angel," and [the victim] replies "You're quite an angel yourself."

> [The defendant] says something, and she replies in French, "Thank you, my good man."

> [The defendant] pays the victim a compliment about something, [the victim] says "You're not so bad yourself." They're talking about what happened on the top of the Lindsey Building. Would a victim begin telling her assailant "I lost my earring up there, ha, ha."?

> I mean, ladies and gentlemen, you come to this trial [with] an incredibly valuable asset, and that's your common sense that

6

you have developed from your life experience. You may have been teenagers once, but you're not teenagers anymore.

Would a victim of sexual assault say to her assailant a day or two later, "Ha, ha, ha, the prose of French." How about in response to a compliment by [the defendant] that "You're incredible." She responds "As are you. (French spoken)."

At another point, she thanks him, "(French spoken)." And at the end of one conversation a few days later, he says "Happy dreams." And she replied "And you, too."

There were e-mails even about birth control, condom, [the defendant] responded to those. As [the defendant] told you yesterday, he was puzzled by why [the victim] was doing this, but wanted to reassure her that in his view, he knew she could never be pregnant, and just went along with it so she could be reassured, and in the end, she was.

. . . .

So I respectfully submit that the evidence of the entire encounter between [the defendant] and [the victim], not just based on the physical evidence, not just based on the doctor visits that I've just described, not just based on the statements [the victim] made coming out of Lindsey Building to her friend, . . . to her housemate, . . . and to her closest friend, . . . and also on her statements to Detective Curtin about what she thought [the defendant] would have realized, but above all, above all, the e-mails between [the defendant] and [the victim] beginning minutes -- well, let's say 20 minutes, after they got back to their dorms, and starting at that point going up to several days later, I submit that when you look at those words of [the victim], herself, it would be impossible to conclude that those were the words, these were the statements, and that these were the actions of a person, who during that encounter was not consenting and was not willing, and so on.

He also told the jury:

Every indictment that alleges that [the defendant] had some kind of contact of whatever nature with [the victim] and did so either without her consent or with her surprise, every single one of those indictments, you don't even have to reach the point of whether you have a reasonable doubt because the evidence is

7

overwhelming on those indictments that [the defendant] is not guilty.

And, he concluded by saying:

> Members of the jury, it's not about that [the defendant] had excellent academics or was a terrific athlete. I'm not saying he is a saint, he's not a saint, he's a teenager, but I submit he told you the truth from that stand, and at the end of the day if you cannot say I believe everything [the victim] said beyond a reasonable doubt, then the Prosecutor has not met her burden on any of the charges and the Defendant is entitled to be found by you not guilty.

Thereafter, the trial court instructed the jury with regard to the computer services use charge as follows:

> Indictment 973494C accuses the Defendant of prohibited uses of computer equipment. The definition of this offense has three parts or elements. The State must prove each element beyond a reasonable doubt.

> Thus, the State must prove first, the Defendant utilized a computer online service, and/or internet service to seduce, solicit, lure, or entice another person to engage in an act of sexual penetration . . . ; second, the Defendant actually believed that the person he was attempting to seduce, solicit, lure, or entice, was under the age of 16; and third, the Defendant acted knowingly.

> The first element of the crime of prohibited uses of computer equipment requires the State to prove that the Defendant utilized the computer -- a computer online service and/or an internet service, to seduce, solicit, lure, or entice another person to engage in sexual penetration.

> . . . .

> The definition of sexual penetration includes sexual intercourse and cunnilingus. Sexual penetration also includes any intrusion, however slight, by any part of the Defendant's body into the genital opening of the other person's body. . . .

> The second element involving the other person's age is self-explanatory. No further definition is required.

> The third element requires the State to prove the Defendant's mental state. Here, that he acted knowingly. This means that the

8

State must prove that the Defendant was aware that his acts would cause the prohibited result.

The State does not have to prove that the Defendant specifically intended or desired a particular result. What the State must prove is that the Defendant was aware or knew that his conduct would cause the result.

Whether the Defendant acted knowingly is a question of fact for you to decide. Keep in mind that there is often no direct evidence of intent because there is no way of examining the operation of a person's mind. You should consider all the facts and circumstances in evidence in deciding whether or not the State has proved that the Defendant acted knowingly.

On the first day of trial, the court had instructed the jury that "[t]he opening and closing statements of the attorneys are not evidence."

The jury returned not guilty verdicts on all of the AFSA charges and the misdemeanor simple assault charge. The jury found the defendant guilty of the felony computer services use charge, three misdemeanor sexual assault charges, and the misdemeanor endangering the welfare of a child charge.

C. Motion for Ineffective Assistance of Counsel

Shortly after the jury returned its verdicts on August 28, 2015, the defendant moved to set aside the verdict on the computer services use charge, asserting that his conviction was "inconsistent with the overall purpose of the Criminal Code" and that it "violate[d] his rights under the State and Federal Constitutions." Alternatively, the defendant asked to be relieved of the obligation to register with the sex offender registry. The trial court ruled that the motion was untimely, but denied it on its merits nevertheless. In doing so, the trial court found that the evidence was "legally sufficient to support the jury's verdict of guilty on the computer [services use] indictment."

Thereafter, the defendant appealed his convictions to this court. See Labrie, 171 N.H. at 477. As to the computer services use charge, the defendant argued that the evidence was insufficient to establish that "when he communicated with the victim over a computer network, he intended to 'seduce, solicit, lure, or entice' [her], with the belief that she was under the age of 16, to engage in an act of sexual penetration." Id. at 482; see RSA 649-B:4, I(a).

While the defendant's direct appeal of his convictions was pending, he moved for a new trial based upon ineffective assistance of trial counsel. Processing of his direct appeal of his convictions was stayed.

9

The trial court held a three-day evidentiary hearing on the defendant's motion for a new trial. Carney and Zaganjori testified that the defendant consistently denied all the charges against him. As a result, their trial strategy was to defend the charges by arguing that the defendant did not penetrate the victim sexually.

The defense strategy with respect to the computer services use charge was, in Zaganjori's words, "encompassed in [the] general theory of the case," which was that, on the night in question, the defendant "didn't meet up with [the victim] . . . to engage in sexual intercourse, but just to have a romantic special evening." He explained: "[O]ur theory of the case was that he met up with [the victim] that evening . . . with romantic ideas, but not to engage in sexual intercourse, and our defense was that no intercourse had occurred . . . ." Zaganjori opined that this theory was "consistent . . . with not being responsible under the computer [services use] statute because the question would be, obviously, what was his intent when he sent those particular messages, and we . . . [went] to great lengths to illustrate that his intent at that time was not to have sex." Zaganjori testified that to illustrate the defendant's intent, defense counsel "cross-examined several of [the victim's] friends, as well as several of [the defendant's] friends and . . . elicited from them that some of the terminology that was used [in the messages] . . . , that those terms didn't necessarily mean sexual intercourse." In addition, he testified that defense counsel "challenged whether sexual intercourse had actually occurred," and that the defendant testified that "his intent was not to go there to have sex." Zaganjori testified that the defense theory was that if defense counsel were able "to show that sexual intercourse did not, in fact, occur, then a jury [would be] less likely to believe that that was his intent originally." Zaganjori testified that he "knew that [the defendant] could be convicted of the computer [services use] charge based on the misdemeanor sex offenses." He also agreed that the defendant could be found not guilty "on all the sexual assault charges, [both] misdemeanor and felony, and still be found guilty of the computer [services use] charge." Zaganjori believed that this result — that the defendant would be acquitted of the AFSAs and the misdemeanor sexual assault charges, but convicted of the computer services use charge — "was probably unlikely."

Carney testified that the defense team pursued three defenses to the computer services use charge: (1) to challenge, at trial, the State's contention that the defendant penetrated the victim; (2) to argue, post-trial, if the defendant were convicted of the computer services use charge and the misdemeanor sexual assaults, but not of the AFSAs, that it was contrary to legislative intent to apply the computer services use statute to him; and (3) to argue, post-trial, if the defendant were convicted of the computer services use charge and the misdemeanor sexual assaults, but not of the AFSAs, that the penalty under the computer services use statute constituted cruel and unusual punishment. See State v. Serpa, 170 N.H. 781 (2018) (ruling upon similar arguments). With respect to the defense team's trial strategy, Carney testified

10

that the team "tried to very zealously contest the government's allegation that [the defendant] had engaged in any type of sexual activity with [the victim] that involved penetration. So we contested whether it had been forcible and we contested whether it had even occurred at all." His "view was that if [the defendant] were acquitted of the forcible charges and . . . the consensual charges, then it was highly likely, if not almost certain, that the jury would acquit him on the computer charge, as well." He explained:

> If [the defendant] had forcibly raped [the victim], then I felt someone could infer that that was his intent in communicating with her to set up the meeting.

> If [the defendant's] intent were to have a sexual experience with [the victim] that included penetration, then it would be possible to conclude that that was his intent in sending a communication, setting up the meeting with her.

> So the jury's verdicts on those two sets of charges would be very much an indication of what the jury thought [the defendant's] intention was in setting up the meeting with [the victim].

> So if we focus on what actually happened during the meeting, then the computer charge would follow along.

> So that was how to attack that charge during the trial. And I think we went very vigorously the entire trial rebutting the evidence of forcible sexual activity and with [the defendant's] testimony in particular any type of sexual activity that involved penetration.

The defendant argued that his trial counsel rendered ineffective assistance in part because they "failed to challenge the application of the [computer services use] statute during trial." He observed that his trial counsel "made no argument to the jury regarding [the computer services use] offense either in the opening statement, closing argument, or through cross-examination of witnesses" and that counsel failed to challenge the sufficiency of the evidence on that charge at trial. The trial court noted that the defendant brought a sufficiency argument in his motion to set aside the verdict and that the court had rejected that argument on the merits, finding the evidence "legally sufficient" to support the defendant's conviction on the computer services use charge. The court concluded, therefore, that because the assertion of a claim of insufficiency during trial would not have changed the outcome of the case, counsel's performance was not constitutionally infirm.

Subsequently, the defendant timely filed the instant appeal, contesting the trial court's denial of his motion for a new trial based upon ineffective

assistance of counsel.  After this appeal was accepted, processing of the defendant's direct appeal continued, and in November 2018, we affirmed his convictions.  See Labrie, 171 N.H. at 475, 477.  As to the computer services use charge, we held that regardless of whether we analyzed each pre-encounter communication individually, or considered them collectively, "[t]here was ample evidence of the defendant's intent to 'solicit, seduce, lure, or entice' the victim to engage in sexual penetration throughout early 2014."  Id. at 485.  Accordingly, we found the evidence sufficient to support his conviction on the computer services use charge.  Id.

## II.  The Defendant's Appellate Arguments

On appeal, the defendant argues that his trial counsel rendered ineffective assistance in challenging the computer services use charge, in violation of the State and Federal Constitutions.  See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. VI, XIV.  Specifically, he contends that his trial counsel was ineffective "in failing to contest the mens rea element" of the computer services use charge and "in failing to contest the actus reus element of use of the internet or an on-line service."  With regard to the mens rea element, he argues that trial counsel was ineffective because "counsel never mentioned [the computer services use] charge or [the defendant's] defense to it to the jury, either in opening statement, closing argument or otherwise."  As to the actus reus element, he argues that his trial counsel was ineffective because counsel "did not consider the possibility of" or advance "a defense based on the intranet character of the [SPS] network."  (Emphasis omitted.)

"Part I, Article 15 of the State Constitution and the Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant reasonably competent assistance of counsel."  State v. Brown, 160 N.H. 408, 412 (2010) (quotation omitted); see Strickland v. Washington, 466 U.S. 668, 685-86 (1984).  We first address the defendant's claims of ineffective assistance of counsel under the State Constitution, citing federal opinions for guidance only.  State v. Ball, 124 N.H. 226, 231-33 (1983).

To prevail upon a claim of ineffective assistance of counsel, the defendant must demonstrate, "first, that counsel's representation was constitutionally deficient and, second, that counsel's deficient performance actually prejudiced the outcome of the case."  Brown, 160 N.H. at 412 (quotation omitted).  "To satisfy the first prong of the test, the performance prong, the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. (quotation omitted).  We judge the reasonableness of counsel's conduct based upon the facts and circumstances of that particular case, viewed at the time of that conduct.  Id.  As we have previously stated:

> Judicial scrutiny of counsel's performance must be highly deferential.  A fair assessment of attorney performance requires

12

that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 412-13 (quotation omitted); see Strickland, 466 U.S. at 689. Strategic or tactical decisions, made after a thorough investigation of the law and facts, "are virtually unchallengeable" in an ineffective assistance claim. Strickland, 466 U.S. at 690. When reviewing an ineffective assistance of counsel claim, we are mindful that the State and Federal Constitutions guarantee "reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (per curiam).

Because the proper measure of attorney performance is reasonableness under prevailing professional norms, to establish that his trial attorney's performance fell below this standard, the defendant has to show that "no competent lawyer" would have engaged in the challenged conduct. State v. Cable, 168 N.H. 673, 680-81 (2016) (quotation omitted). Thus, in the instant case, to prevail on the first prong, the defendant must show that "no competent lawyer" would have failed to: (1) mention the computer services use charge in opening statement or closing argument; and/or (2) consider or mount a specific defense to the computer services use charge by arguing that the computer services use statute did not apply to the defendant's e-mails to the victim because SPS's computer network is an intranet network. Id.

To satisfy the second prong, the prejudice prong, the defendant must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Brown, 160 N.H. at 413 (quotation omitted); see Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Brown, 160 N.H. at 413 (quotation omitted). In making this determination, we consider "the totality of the evidence presented at trial." Id. (quotation omitted).

Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact. Id. Therefore, we will not disturb the trial court's factual findings unless they are not supported by the evidence or are erroneous as a matter of law, and we review the ultimate determination of whether each prong is met de novo. Id. "On appeal, when we determine that a defendant has failed to meet either prong of the test, we need not consider the other one." Cable, 168 N.H. at 681 (quotation omitted).

A.  Mens Rea Defense

The defendant first maintains that his trial counsel was ineffective for failing to mention in opening statement or closing argument or otherwise the computer services use charge or the defense that he did not intend to engage in sexual penetration with the victim when he sent the e-mails and Facebook messages at issue.  He argues that counsel "should plainly have told the jury that it could only convict if it could find, beyond a reasonable doubt, that [the defendant] intended, when he sent the messages, to lure [the victim] to engage in sexual penetration."

The right to effective assistance extends to opening statements and closing arguments.  See Yarborough, 540 U.S. at 5 (referring to closing arguments); Bruce v. Kramer, No. CV 05-867GAF(JC), 2010 WL 466156, at *17 (C.D. Cal. Jan. 27, 2010) (referring to opening statements).  "Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions" in opening and closing presentations "is particularly important because of the broad range of legitimate defense strategy" at those stages.  Yarborough, 540 U.S. at 5-6.  Opening statements and closing arguments "should sharpen and clarify the issues for resolution by the trier of fact, but which issues to sharpen and how best to clarify them are questions with many reasonable answers."  Id. at 6 (quotation and citation omitted).

Judicial review of a defense counsel's opening statement and closing argument is, thus, highly deferential.  See id.  "Courts are . . . hesitant to find that an attorney's decision to leave out reference to particular aspects of the case" in opening statement or closing argument "constitutes ineffective assistance."  Knight v. Spencer, 447 F.3d 6, 18 (1st Cir. 2006).  "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."  Yarborough, 540 U.S. at 8.  Indeed, "[b]ecause the decision to make an argument or assert a specific defense is at the heart of trial strategy, defendants face considerable difficulty in showing that counsel's tactics were unreasonable."  John M. Burkoff & Nancy M. Burkoff, Ineffective Assistance of Counsel § 7.1, at 342 (2017 ed.).  Counsel's opening statement and closing argument "must . . . be viewed in the context of the entire proceeding."  Knight, 447 F.3d at 18.

Here, the prosecutor told the jury that the critical issue in the case was the victim's credibility.  Thus, defense counsel's opening statement and closing argument centered upon attacking that credibility.  Consistent with defense counsel's overall theory of the case, counsel focused particularly upon the victim's credibility related to consent and penetration.

In his opening statement, Carney used the electronic messages that the defendant and victim had exchanged as evidence that the victim's claim of rape was a lie. He asked the jury to focus upon whether, in light of the victim's words in her e-mail messages to the defendant, she "appears to have been unwilling during her date." After quoting those messages in their entirety, Carney asked the jury: "Does this sound like texting where she was unwilling that night, where the prosecutor is going to be able to show by these words that very night that these are the words of a rape victim? He ended that part of his opening statement by saying:

> Her own words, no force, no compulsion. She's in her room. He's in his room. She's typing all of these words. That will be, I submit, the most important evidence on that issue about whether she was an unwilling participant in what happened that night. In other words, whether she was a rape victim or whether she was a willing participant.

Similarly, in his closing argument, Carney intimated that the victim's words in her electronic messages to the defendant were not those of a rape victim, and that she had lied about the rape because she was worried about disappointing her sister and parents and about her reputation on campus. He reminded the jury that, although the victim's friend had testified that, before meeting the defendant on May 30, the victim had said, "I'll probably let him finger me and I'll probably blow him," the victim claimed not to have remembered saying that. (Quotation omitted.) Carney invited the jury to find that in so saying, the victim had lied. He then told the jury:

> The Prosecutor said something during her opening, she said
>
> > "In order to prove the government's case, you have to believe [the victim]."
>
> > His Honor will tell you that you have to believe in the government's case beyond a reasonable doubt. If you can't say I can believe [the victim] beyond a reasonable doubt, after this blatant lie to you, then you've got to return a verdict of not guilty.

Viewing defense counsel's opening statement and closing argument in the context of the entire proceeding, see Knight, 447 F.3d at 18, we conclude that the defendant "ha[s] failed to rebut the presumption of adequate assistance," Yarborough, 540 U.S. at 9. We cannot say that defense counsel's strategic use of the electronic messages to attack the victim's credibility, instead of to prove the defendant's intent, "fell below an objective standard of reasonableness." Brown, 160 N.H. at 412 (quotation omitted).

Nor can we fault defense counsel for choosing to defend against all of the charges the defendant faced by focusing upon whether penetration occurred and whether the victim consented. Given the number of charges that required proof of penetration and the number of felony charges that required proof of lack of consent, this was a reasonable strategy. "This is precisely the sort of calculated risk that lies at the heart of an advocate's discretion." Yarborough, 540 U.S. at 9.

Although the defendant argues that his trial counsel "ignored the computer felony charge because they believed that no conviction on that charge would be legally proper if the defense prevailed on the other charges," our review of Zaganjori's testimony, in particular, does not demonstrate that counsel misunderstood the applicable law. Zaganjori specifically testified that he understood that the defendant could be found not guilty of all but the computer services use charge. Indeed, he agreed that the computer services use statute does not require that the perpetrator ever have any physical contact with the recipient of the communication and that "[t]he offense is complete as soon as the communication is sent." Zaganjori's belief that this result — acquittal on all of the charges except the computer services use charge — was unlikely is not unreasonable. Also reasonable is trial counsel's belief that if the jury had found that no sexual penetration occurred, it would also likely find that the defendant lacked the intent to sexually penetrate when he sent the victim electronic messages in the days leading up to their encounter. In addition, although counsel did not specifically refer to the computer services use charge in his opening statement or closing argument, it was reasonable for him to count on the court's jury instructions to remind the jury of the elements of that charge. See id. at 10. We likewise find reasonable trial counsel's strategy of waiting until after the verdict to argue that applying the computer services use statute to the defendant, even though the jury found him not guilty of the other felony charges, was inconsistent with the purpose of the statute and with the Eighth Amendment to the Federal Constitution.

Contrary to the defendant's assertions, although defense counsel did not explicitly tell the jury that the defendant lacked the requisite intent for conviction on the computer services use charge, throughout the trial, the defense attacked the State's circumstantial evidence of that intent. For instance, through cross-examination of the defendant's friends, defense counsel elicited testimony that the defendant never expressed a plan to engage in sexual penetration with the victim or had an expectation that he would do so. Indeed, defense counsel elicited testimony from most of the SPS witnesses that the terms that the defendant used in his electronic messages to his friends could describe a range of activities, not just sexual contact. Defense counsel also elicited testimony from the defendant, during his direct examination, that "it hadn't been [his] intention going into the night to have sex with [the victim]."

16

Even if telling the jury explicitly that the defendant lacked the intent necessary to convict him of the computer services use charge "would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing" to say that. Id. at 7. An advocate "is not required to summarize or comment upon all the facts, opinions, inferences, and law involved in a case." Id. at 8 (quotation omitted). Indeed, "judicious selection of arguments" for opening statement and summation "is a core exercise of defense counsel's discretion." Id.

Counsel's decision to focus his opening statement and closing argument on attacking the victim's credibility and to defend all of the charges the defendant faced by focusing on penetration and consent are tactical decisions that fall within the wide range of reasonable professional assistance. "Given the wide latitude of discretion available to defense counsel to conduct the defense in the manner of his or her own choosing," Knight, 447 F.3d at 18, the opening statement and closing argument and defense mounted by the defendant's trial counsel cannot be deemed ineffective assistance of counsel. Accordingly, we hold that trial counsel's failure to mention a specific defense to the computer services use charge in his opening statement and closing argument did not violate the defendant's state constitutional right to effective assistance of counsel. See Brown, 160 N.H. at 415. Because the standard for determining whether a defendant has received ineffective assistance of counsel is the same under both the State and Federal Constitutions, we necessarily reach the same result under the Federal Constitution as we do under the State Constitution. Id. at 418.

### B. Intranet Defense to Computer Services Use Charge

The defendant next asserts that his trial counsel was ineffective because counsel did not consider or advance a defense to the computer services use charge by arguing that use of SPS's intranet network did not constitute computer services use within the meaning of RSA 649-B:4, I. To address this argument, we interpret the computer services use statute, RSA 649-B:4, I. The interpretation of a statute is a question of law, which we review de novo. Serpa, 170 N.H. at 784. In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. Id. We first look to the language of the statute itself. Id. "We will follow common and approved usage except where it is apparent that a technical term is used in a technical sense." Appeal of Public Serv. Co. of N.H., 125 N.H. 46, 52 (1984); see RSA 21:2 (2012). We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Serpa, 170 N.H. at 784. However, we will not interpret statutory language in a literal manner when such a reading would lead to an absurd result. Id. Moreover, we do not strictly construe Criminal Code provisions, but rather

17

construe them "according to the fair import of their terms and to promote justice." RSA 625:3 (2016).

RSA 649-B:4, I, provides:

> No person shall knowingly utilize a computer on-line service, internet service, or local bulletin board service to seduce, solicit, lure, or entice a child or another person believed by the person to be a child, to commit any of the following:

> (a) Any offense under RSA 632-A, relative to sexual assault and related offenses.

> . . . .

> (c) Endangering a child as defined in RSA 639:3, III.

The defendant contends that his use of the SPS intranet network to send e-mails to the victim does not constitute using a "computer on-line service," an "internet service," or a "local bulletin board." Thus, he asserts that his trial counsel was ineffective for failing to consider or present a defense to the computer services use charge on that ground.

When, as in RSA 649-B:4, I, the legislature has used "technical words and phrases" that "have acquired a peculiar and appropriate meaning in law," we construe those words and phrases "according to such peculiar and appropriate meaning." RSA 21:2. Based upon the technical meaning of the statutory terms, we conclude that SPS's intranet network constitutes an "internet service" within the meaning of RSA 649-B:4, I.

The word "internet" refers to "a worldwide system of interconnected computer networks, communicating by means of TCP/IP and associated protocols." McGraw-Hill Dictionary of Scientific and Technical Terms 1101 (6th ed. 2003); see The American Heritage Dictionary of the English Language 916 (5th ed. 2011) (defining the word "internet" as "a "publicly accessible system of networks that connects computers around the world via the VCP/IP protocol"). As one author has described it:

> The Internet or "Net" is a system of linked computer networks, international in scope and decentralized by design, that facilitates communication among computers connected to it. It allows computers to transparently "talk to one another" and share services throughout much of the world. It does this by finding a path to route tiny packets of data from one computer to another, based on a standard called the Internet Protocol or "IP." . . .

18

> Many services use the Internet as their transport medium. These include Internet e-mail, file transfer (ftp), network news (non-interactive message-oriented discussion groups), interactive chat, video conferencing, Internet telephony, streaming media (audio and video), and the World Wide Web, among many others. The World Wide Web may be the most visible, but it is just one of many services built on top of the Internet.

Joseph Kershenbaum, The Unillustrated Guide to Cyberspace, 25 Vt. B.J. 11, 11 (1999).

An "intranet" is a "private network, based on Internet protocols, that is accessible only within an organization." McGraw-Hill Dictionary of Scientific and Technical Terms, supra at 1106. Put another way, an "intranet is a private network of linked computer networks that uses the same kinds of software used on the Internet, but that is only for internal use." Kershenbaum, supra at 12. "An intranet commonly includes connections through one or more gateway computers to the outside Internet." Id. Thus, "[m]any observers have accurately described an intranet as a 'private Internet.'" M. Sean Fosmire, Intranets and Extranets—The Extension of Web Technology to the Distribution of Private Information, 77 Mich. B.J. 412, 412 (1998).

Based upon the technical meaning of the terms "intranet" and "internet," we hold that use of SPS's intranet network constitutes use of an "internet service" within the meaning of RSA 649-B:4, I. We decline the defendant's invitation to examine the statute's legislative history because "we find nothing ambiguous about the statutory language." Sutton v. Town of Gilford, 160 N.H. 43, 55 (2010). Because we have interpreted the statute according to its plain language, we also do not invoke the rule of lenity, despite the defendant's urging that we do so. See Labrie, 171 N.H. at 484 n.3; see also State v. Brooks, 164 N.H. 272, 292 (2012) (stating that the "rule of lenity serves as a guide for interpreting criminal statutes where the legislature failed to articulate its intent unambiguously" (quotation omitted)).

Having rejected the defendant's construction of the computer services use statute, we hold that he has not demonstrated actual prejudice from his trial counsel's failure to mount an intranet defense to the computer services use charge, and, thus, has not established under the State Constitution that his trial counsel rendered ineffective assistance of counsel. See Brown, 160 N.H. at 412. We reach the same result under the Federal Constitution because the standard for determining whether a defendant has received ineffective assistance of counsel is the same under both constitutions. See id. at 418.

Affirmed.

LYNN, C.J., and DONOVAN, J., concurred.