IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 6, 2019 Session

## CHRISTOPHER BROWN v. STATE OF TENNESSEE

Appeal from the Criminal Court for Shelby County
No. 13-05989       J. Robert Carter, Jr., Judge

_____

### No. W2018-01705-CCA-R3-PC

_____

The Petitioner, Christopher Brown, appeals the denial of his petition for post-conviction relief, in which he challenged his convictions for one count of first degree premeditated murder and three counts of aggravated assault and his effective sentence of life imprisonment plus ten years. On appeal, the Petitioner contends that: (1) post-conviction counsel had a conflict of interest that disqualified him from representing the Petitioner at the hearing; (2) trial counsel provided ineffective assistance; and (3) post-conviction counsel was ineffective at the post-conviction hearing. Upon reviewing the record and the applicable law, we conclude that the Petitioner is entitled to a new hearing based upon post-conviction counsel's conflict of interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JOHN EVERETT WILLIAMS, P.J., filed a dissenting opinion.

Lance R. Chism (on appeal) and John Scott (at hearing), Memphis, Tennessee, for the appellant, Christopher Brown.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd and Scott Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

#### Trial Proceedings

The evidence presented at trial established that on the night of June 22, 2013, the Petitioner shot multiple times into an SUV which Albert Fips was driving and in which Ms. Carolyn Pratcher, Ms. Ida Pratcher, and Michael Douglas were passengers. See State v. Christopher Brown, No. W2015-00990-CCA-R3-CD, 2016 WL 1446221, at *1 (Tenn. Crim. App. Apr. 12, 2016). Ms. Carolyn Pratcher and the Petitioner had been in a long-term relationship, which had ended shortly before the shooting, and she was living with Mr. Fips at the time of the shooting. Id. at *3. Mr. Fips sustained two gunshot wounds to his chest, a gunshot wound to his right arm and buttock, and grazing wounds to his left hand and left arm, and he died as a result. Id. at *7.

Ms. Carolyn Pratcher testified at trial regarding her tumultuous relationship with the Petitioner. Brown, 2016 WL 1446221, at *3. In October 2011, when she informed the Petitioner of a fire at a nearby apartment, the Petitioner responded, "B--ch, I told you to stay out of other people's business." Id. He then pulled her hair and dragged her upstairs. Id. One of her sons called the police, and the Petitioner was arrested and later convicted in connection with the attack. Id.

In June 2013, while the Petitioner and Ms. Carolyn Pratcher were living at a different home, the Petitioner "put [her] out," and she moved in with Mr. Fips, who lived four or five houses away from the Petitioner. Brown, 2016 WL 1446221, at *3. Ms. Carolyn Pratcher testified that the Petitioner began sending her threatening text messages. Id. On one occasion, the Petitioner came to Mr. Fips's house, and Mr. Fips told him to walk outside to talk. Id. Once outside, they "had words" but did not have a physical confrontation. Id. Around June 7, 2013, Mr. Fips's tires were slashed, and the Petitioner later admitted to Ms. Carolyn Pratcher that he had slashed the tires. Id. On June 17, 2013, Ms. Carolyn Pratcher went to the Petitioner's home because the Petitioner said he would give her money for their son's birthday. Id. Instead, the Petitioner grabbed her around the neck, tried to drag her into the house, and told her, "I'm going to get [your] a--." Id. The Petitioner let her go once their son ran across the street.

On the night of the shooting, Mr. Fips drove past the Petitioner's residence, where Ms. Carolyn Pratcher saw the Petitioner sitting on his front porch. Brown, 2016 WL 1446221, at *3. The Petitioner walked toward the vehicle while shining a light from his cell phone toward them. Id. Ms. Carolyn Pratcher said that Mr. Fips backed up the vehicle, rolled down his window, and told the Petitioner that he wanted to talk to him about text messages that the Petitioner had sent to him. Id. Ms. Carolyn Pratcher testified that the Petitioner shot into the vehicle approximately five times while standing ten to fifteen feet away. Id. Ms. Carolyn Pratcher was injured, and she ran behind an abandoned house while the Petitioner chased her. Id. at *4. She stopped running because she had been shot twice, was losing blood, and felt as if she were going to pass out. Id. The Petitioner caught up to her and grabbed her "around [the] neck." Id. He had

something in his hand, but Ms. Carolyn Pratcher did not know whether it was a knife or a gun. Id. Some bystanders called 9-1-1, and the Petitioner fled the scene before police officers arrived. Id.

Ms. Ida Pratcher testified that when Mr. Fips saw the Petitioner sitting on his porch on the night of the shooting, Mr. Fips backed up his vehicle and said the Petitioner wanted to talk to him. Brown, 2016 WL 1446221, at *4. When Mr. Fips stopped, the Petitioner began walking toward them. Id. Mr. Fips asked the Petitioner why he was following Mr. Fips and sending him text messages. Id. Ms. Ida Pratcher said that Mr. Fips was about to open the door and believed that the Petitioner came to the vehicle and shut the door. Id. The Petitioner told Mr. Fips, "[W]hen I texted you[,] I told you mother f--kers when I see you again, I'm going to kill you." Id. Ms. Ida Pratcher fell and hurt her knee while escaping from the vehicle. Id. The vehicle then ran over the side of her foot, coasted down the street, and hit a curb before stopping. Id. Ms. Ida Pratcher was later transported to the hospital and treated for a fractured ankle. Id. She identified the Petitioner as the shooter in a photographic lineup that night. Id.

Mr. Douglas testified that he heard approximately three gunshots, but he did not know the Petitioner and could not identify the shooter because it was too dark. Brown, 2016 WL 1446221, at *5. Mr. Douglas said he was afraid and ran from the scene once he was able to get out of the vehicle. Id. Ms. Carolyn Pratcher, Ms. Ida Pratcher, and Mr. Douglas testified that no one inside the vehicle had a gun, and Ms. Carolyn Pratcher and Mr. Douglas testified that Mr. Fips was not known to carry a gun. Id. at *3-5.

When police officers arrived at the scene, they found Mr. Fips slumped over in the front seat of the SUV, which had struck another vehicle, and one officer described Mr. Fips as lying across the front seat. Brown, 2016 WL 1446221, at *5-6. Officers collected the Petitioner's cell phone from his front porch and later obtained Ms. Carolyn Pratcher's cell phone. Id. at *6. Through a search warrant, officers obtained information from both cell phones, including text messages. Id. At approximately 7:21 p.m. on the night of the shooting, Ms. Carolyn Pratcher received a text message from the Petitioner that read, "I'm fixin' to kill myself. They will find me dead in this house when police break in I'll be gone. F--k it." Id. At 9:59 p.m., she received a text message from the Petitioner that read, "Dude, no what's up. It's time to roll. Real talk. You need to go somewhere fast. You say you want and love me. Make your move. This is not living." Id.

Although the Petitioner called police shortly after the shooting, asserting that "the guy made a pistol play," he ultimately fled. Brown, 2016 WL 1446221, at *6. The Petitioner was located in California several months after the shooting. Id. He contacted Ms. Carolyn Pratcher from California a couple of weeks after the shooting and stated that

he had used a .22-caliber gun to shoot her and Mr. Fips.  Id. at *4.  The Petitioner also called her while he was in jail following his arrest, and he encouraged her to change her story and tell the police officers that Mr. Fips had a gun and that the Petitioner acted in self-defense.  Id.

The jury convicted the Petitioner of first degree premeditated murder and three counts of aggravated assault, and the trial court imposed an effective sentence of life plus ten years.  Brown, 2016 WL 1446221, at *7.  This court affirmed the trial court's judgments on direct appeal.  See Id. at *1.

Post-Conviction Proceedings

In June 2017, the Petitioner filed a timely pro se petition for post-conviction relief in which he raised multiple claims, including a claim that he received ineffective assistance of counsel at trial.  On June 30, 2017, the post-conviction court entered an order appointing post-conviction counsel to represent the Petitioner.  Post-conviction counsel did not file an amended petition or a certification as required by Tennessee Supreme Court Rule 28.

At the post-conviction hearing, there was an exchange between post-conviction counsel and the post-conviction court regarding the fact that since his appointment to represent the Petitioner, post-conviction counsel had accepted employment with the Shelby County Public Defender's Office, where trial counsel was employed both at the time of the post-conviction hearing and at trial.  The following exchange occurred during a bench conference:

> [POST-CONVICTION COUNSEL]:  You've already ruled on this. There is no issue as far as conflict and all that.  I just want to put on the record before we start the hearing that I have brought that up in the past and we did discuss it with [the Petitioner] and just for the purpose of making a record that I brought it up.
>
> Basically that I was appointed privately.  I'm now hired by the PD's office.  There is [an] appearance of conflict, you said you don't – that the conflict – I'm not going to ask you to change your ruling.  I just wanted to put it on the record before we start the hearing, Judge.
>
> THE COURT:  All right.  And Mr. Brown is comfortable with that as well; is that correct?

- 4 -

[POST-CONVICTION COUNSEL]:  He – well, he sent me letters addressing the PD's office.  I don't think it's been a problem.  I've talked to him about it and I don't think there's an issue.  But I just wanted to put it on the record so that if anything ever happened and it comes back we'll have a record of it.

I think we have already argued it on the record, but just in case.

THE COURT:  I think so too.

[POST-CONVICTION COUNSEL]:  I don't recall the dates, though.  Thank you.

Thereafter, the following exchange occurred in open court:

[POST-CONVICTION COUNSEL]:  . . . If I may briefly, Judge.  I just for the record we discussed this earlier.  I was appointed as private counsel to represent [the Petitioner].  Subsequent to that I became employed with the county in the Public Defender's Office and requested to be relieved.

That request was denied.  I just wanted to point out for the record that I did make such a request and all parties – we didn't have a hearing on it, Judge, I don't believe, but I just that request was made, Your Honor.  And (indiscernible) –

THE COURT:  And for the record let me clear that up.  You had accepted appointment, I mean, employment with the public defender's office after having gotten this case ready and representing [the Petitioner] and being ready for this hearing.

I think I instructed you obviously not to have any conversation with people in your new office … about anything that would be inappropriate.  Rather than derail [the Petitioner's] hearing and start it over with somebody fresh I feel comfortable that … you can represent his interest in this[.]

Do you understand that, Mr. Brown?

THE PETITIONER:  Yes, sir.

THE COURT:  Do you agree with that?

THE PETITIONER:  Yes, sir.

During the hearing, trial counsel, an attorney with the Shelby County Public Defender's Office, testified that he was appointed to represent the Petitioner at trial. Post-conviction counsel framed his questioning in terms of "going . . . through some of the claims of [the Petitioner's] petition[.]"  Trial counsel did not remember whether he consulted with or obtained an expert opinion in the Petitioner's case.  He stated that he reviewed discovery with the Petitioner, that the Petitioner told him what had occurred, and that he considered the Petitioner's statements in determining a theory of the defense. Trial counsel recalled that the defense strategy was to argue that the killing was not premeditated or intentional in an effort to obtain a conviction on a lesser-included offense of first degree premeditated murder.  He said that part of the defense theory was that the victim may have had a gun, that there had been "bad blood" between the Petitioner and the victim, and that the killing occurred "in the heat of passion."

Trial counsel recalled reviewing the angles of the victim's bullet wounds and noted that the victim was not shot exactly through the backside but was shot "somewhat through the side and the back."  He acknowledged that it was possible that one of the bullets entered through the victim's back.  Trial counsel did not recall whether he considered employing an expert to test the bullets recovered from the victim's body and said he would have done so if he believed such an expert would have been beneficial to the defense.  Counsel noted that he did not think having an expert "would have gotten anywhere."  Trial counsel did not believe that if any of the recovered bullets had been of a different caliber, it would have assisted the defense.  He believed the issue was whether the victim was in possession of a gun or whether someone in the car had taken a gun from the victim when he or she fled the scene.  Trial counsel noted that there was no evidence that the victim was the first aggressor and stated that the angles of the bullets could be explained as coming from someone shooting into a moving car.

Trial counsel testified that the Petitioner believed someone had moved the victim's body, but trial counsel did not conduct an independent investigation to verify the Petitioner's belief.  Trial counsel did not know how to conduct such an investigation other than to go back in a "time machine . . . and look myself."  No evidence provided in discovery indicated that the victim initially was upright following the shooting and was later found to be slumped over.

Trial counsel testified that he believed he received the cell phone "dump" from the victim's cell phone in discovery, but he could not recall whether he received the "dump" from Ms. Carolyn Pratcher's cell phone.  Trial counsel reviewed cell phone records showing text messages exchanged among several individuals, but he could not recall

- 6 -

from whose cell phone the text messages were recovered. Counsel did not remember whether a transcript was made of a telephone conversation from Ms. Carolyn Pratcher's cell phone. When asked whether the Petitioner asked to review copies of Ms. Carolyn Pratcher's telephone records, trial counsel responded that he did not remember but that it was possible because the Petitioner "asked for a lot of things." Although trial counsel recalled receiving records of text messages from the victim's cell phone, he did not recall whether he received the records on the day of trial. Counsel did not remember how long he spent reviewing the records for exculpatory information.

Although trial counsel recalled a "love triangle situation" between Ms. Carolyn Pratcher, the Petitioner, and the victim, trial counsel did not recall whether he questioned Ms. Carolyn Pratcher on cross-examination regarding the nature of the relationship. Trial counsel explained, "It could have cut either way. It could either be this is a crime of passion or this was somebody who was angry and was intentional with his actions. So I think I would have been careful about using that line of questioning."

On cross-examination, trial counsel testified that he had been practicing primarily in the area of criminal defense for almost twenty years. He began his career at the Shelby County Public Defender's Office, and when he was appointed to represent the Petitioner, he was assigned to the capital defense team. Before the trial, he had handled at least fifty first degree murder cases and had conducted three to five first degree murder trials. He noted that Public Defender's Office employed an internal investigator who assisted with cases and that an additional investigator was assigned to the capital case team. He did not believe that he could have established a particularized need in order to obtain funding for experts to conduct ballistics testing or testing related to the positioning of the victim's body. Counsel agreed that "considerable animosity" existed between the victim and the Petitioner and that he attempted to argue that the murder was committed in the "heat of passion."

Trial counsel stated that the three passengers provided consistent testimony regarding the number of shots fired, the location of the Petitioner and the victim at the time of the shooting, and the victim's being unarmed. Trial counsel said he received discovery from the State, reviewed the discovery with the Petitioner, and provided the Petitioner with the documents of the cell phone "dump." The State originally sought a sentence of life without the possibility of parole, which it withdrew after trial based, in part, on trial counsel's work and negotiations on the Petitioner's behalf.

The Petitioner testified that despite his requests, trial counsel failed to provide him with a copy of Ms. Carolyn Pratcher's cell phone records. The Petitioner stated that the records would have shown calls and text messages establishing that another gun was involved and that "preparations" were made. He said he provided trial counsel with this

information. The Petitioner stated that although he also requested the records from his cell phone, trial counsel only gave him one page of the records. The Petitioner said the records would have shown "what was occurred before the incident so you would have had a better view of what really was going on." He also said that despite his request, trial counsel failed to provide him with records of his telephone call to Ms. Carolyn Pratcher; the Petitioner denied having told her to say he shot the victim in self-defense.

The Petitioner maintained that he shot the victim on the left side but that the victim had a bullet wound to his right buttock. He stated that he asked trial counsel to procure an expert to analyze the bullet fragments found in the victim's body. The Petitioner maintained that such an analysis would have revealed that a bullet of a different caliber from the other bullets was in the victim's body and that, as a result, more than one gun was involved.

The Petitioner testified that he also requested that trial counsel procure an expert to examine the position of the victim's body in the vehicle. The Petitioner stated that after Mr. Douglas fled the scene, he returned and opened the driver's side door of the vehicle. The Petitioner said, "I'm not saying that [Mr. Douglas] was getting a gun off of [the victim] . . . . I don't know if he was going in his pocket getting money or what. But he did something to that extent." The Petitioner maintained that Mr. Douglas then attempted to pull the victim's body out of the car but ultimately repositioned the victim's body inside the car. The Petitioner further maintained that an expert would have established that someone had tampered with the victim's body.

The Petitioner stated that trial counsel did not provide him with the victim's cell phone records until the day of trial. According to the Petitioner, trial counsel said he read in the records that the victim had sent a text message to "Mac" stating, "I need a show stopper for this [C]hris guy." Trial counsel instructed the Petitioner to review the records, but the Petitioner did not have time to do so before the trial. The Petitioner testified that if he had received the records earlier, he would have requested that "Mac" be subpoenaed to testify regarding the meaning of a "show stopper."

The Petitioner acknowledged on cross-examination that neither his weapon nor any other weapon was recovered in the case. He acknowledged that he did not know what Mr. Douglas was doing when he opened the door to the victim's vehicle. The Petitioner did not know whether Mr. Douglas attempted to administer lifesaving measures. The Petitioner acknowledged that the passengers in the vehicle testified that the victim did not have a weapon and was not known to carry a weapon. The Petitioner agreed that he told counsel which information he thought would be contained in the cell phone records.

The post-conviction court entered an order denying the Petitioner's request for post-conviction relief. In doing so, the court noted that although the Petitioner listed "things he wanted," including the telephone records, an expert witness, and the testimony of "Mac," he did not "state or show how any of those items would have been of assistance."

The Petitioner filed a timely notice of appeal to this court. While this appeal was pending, post-conviction counsel filed in this court a motion to withdraw, in which he averred that he had a conflict of interest due to his employment with the Shelby County Public Defender's Office. In his motion to withdraw, post-conviction counsel stated that he believed he was conflicted from proceeding with the appeal because "in order to be an effective advocate for [the Petitioner], [post-conviction counsel] would have to attack the integrity of his own office." This court entered an order allowing post-conviction counsel to withdraw and appointing appellate counsel to represent the Petitioner.

After this appeal was docketed, this court entered an order remanding the case to the post-conviction court for a written order "denying [post-conviction counsel's] motion to withdraw." This court instructed the post-conviction court to include in the order the circumstances under which post-conviction counsel's request to withdraw was presented, any evidence presented during the hearing, and findings of fact and conclusions of law.

The post-conviction court subsequently entered a written order on February 14, 2020, denying post-conviction counsel's oral motion to withdraw. The court stated that post-conviction counsel was in court on an unrelated matter and notified the court of his offer of employment from the Shelby County Public Defender's Office. The court noted that the Petitioner's post-conviction case "was already set for a hearing, and [post-conviction] counsel had represented [the] Petitioner for over a year. Counsel brought this to the court's attention, informally, and the court directed him to continue with his representation of [the] Petitioner." The court "further directed counsel to keep his handling of this matter separate from any new duties" in his new employment. The court stated that trial counsel was a member of the Public Defender's capital defense team and that the court directed post-conviction counsel to maintain confidentiality in the Petitioner's case. The court noted the discussion of the potential conflict before the post-conviction hearing and the Petitioner's "agree[ment]." The court concluded that it "was of the opinion that counsel['s] accepting employment did not automatically create a conflict and further felt that the need for continuity of representation allowed the hearing to be conducted without prejudice to [the] Petitioner."

## ANALYSIS

### I. Conflict of Interest

The Petitioner contends that post-conviction counsel had a conflict of interest in representing him and that, as a result, the post-conviction court erred in denying counsel's request to withdraw. The State responds that the Petitioner has waived this issue for failure to provide a complete record of what transpired.

As a preliminary matter, although the record on appeal is sparse, after supplementing the record with a transcript of the bench conference before the post-conviction hearing and the post-conviction court's written order, we conclude that the record is sufficient for us to review this issue.

Although a petitioner in a post-conviction proceeding does not have a constitutional entitlement to the effective assistance of counsel, the petitioner has a statutory right to counsel. See Tenn. Code Ann. § 40-30-107(b)(1); Frazier v. State, 303 S.W.3d 674, 680 (Tenn. 2010). Our supreme court has recognized that "the statutory right to counsel in a post-conviction case contemplates a conflict-free counsel." Frazier, 303 S.W.3d at 680.

The Rules of Professional Conduct provide that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Tenn. Sup. Ct. R. 8, RPC 1.7(a). A concurrent conflict of interest arises if, in relevant part, "there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer." Id. A conflict of interest "'includes any circumstance in which an attorney cannot exercise his independent professional judgment free' of competing interests." Frazier, 303 S.W.3d at 682 (quoting State v. Culbreath, 30 S.W.3d 309, 312 (Tenn. 2000)).

We review a trial court's findings on attorney disqualification, including the existence of a conflict of interest, for an abuse of discretion. Frazier, 303 S.W.3d at 679; White, 114 S.W.3d at 475. A post-conviction court abuses its discretion when it applies "'an incorrect legal standard'" or reaches "'a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)). However, this court "must afford close scrutiny when disqualification of counsel based upon rules of professional conduct is at issue." Frazier, 303 S.W.3d at 679 (citing Clinard v. Blackwood, 46 S.W.3d 177, 182 (Tenn. 2001)).

Our review of this issue is two-fold. We must first examine whether the post-conviction court abused its discretion in determining that no conflict of interest existed; then, we consider whether the Petitioner validly waived any existing conflict, including

whether the post-conviction court followed the correct procedure once it was alerted to a possible conflict.

In the context of conflicts of interest arising from a defense attorney's accepting employment with a District Attorney General's office, this court has recognized that the "relationships among lawyers within a government agency are different from those among partners and associates of a law firm. The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice." State v. Ricky Raymond Bryan, No. M1999-00854-CCA-R9-CD, 2000 WL 1131890, at *6 (Tenn. Crim. App. Aug. 4, 2000) (quoting United States v. Caggiano, 660 F.2d 184, 191 (6th Cir. 1981)), perm. app. denied (Tenn. Dec. 11, 2000).

However, the distinct nature of government practice with regard to financial incentives does not mean that government attorneys are immune to all competing influences that could give rise to a conflict of interest. In a situation where, as here, post-conviction counsel was in the untenable position of attacking the performance of a senior attorney in his office, such conflicting interests could include the desire to have positive working relationships with one's colleagues and be a "team player"; make a good impression on supervising attorneys; defend the reputation of the office as a whole; and to advance within the agency.

Nonetheless, Tennessee's courts have not yet considered whether a conflict automatically arises when a public defender represents a post-conviction petitioner who claims that trial counsel, another currently-employed public defender, rendered ineffective assistance. Although we conclude below that it is not necessary for us to make such a determination under the facts of this case, we find it instructive to review the approaches taken by other states, which fall into two broad groups.

The first group utilizes a case-by-case examination to determine whether evidence of an actual conflict existed. These states assume that public defenders, unlike private attorneys, have a special duty of loyalty to their clients that would overcome any concern for the reputation of the public defender's office. See, e.g., People v. Banks, 520 N.E.2d 617, 621 (Ill. 1987); State v. Bell, 447 A.2d 525, 528-29 (N.J. 1982); Morales v. Bridgforth, 100 P.3d 668, 669 (N.M. 2004); State v. Lentz, 639 N.E.2d 784, 786 (Ohio 1994); Simpson v. State, 769 A.2d 1257, 1271 (R.I. 2001).

The second group assumes a per se conflict in which a "mere allegation of ineffective assistance is sufficient to create a conflict of interest disqualifying the public defender." State v. Veale, 919 A.2d 794, 799 (N.H. 2007), abrogated in part on other grounds by State v. Thompson, 20 A.3d 242 (N.H. 2011); see Hill v. State, 566 S.W.2d

- 11 -

127, 480 (Ark. 1978); Angarano v. United States, 329 A.2d 453, 458 (D.C. 1974); Adams v. State, 380 So.2d 421, 422 (Fla. 1980); Commonwealth v. Moore, 805 A.2d 1212, 1215 (Pa. 2002). See generally Ryan v. Thomas 409 S.E.2d 507, 508 (Ga. 1991) (noting that Georgia public defenders in the same judicial circuit are bound by the same rules of professional conduct governing imputed conflicts of interest as members of a private law firm, and stating that "it would not be reasonable to expect one member of a law firm to assert the ineffectiveness of another member, where one represented a defendant at trial and the other represented him on motion for new trial or appeal")  The Alaska Supreme Court recently explained that in its view, "public defenders, like any other lawyers, may feel strongly loyal to individual colleagues [or] . . . may fear social or bureaucratic consequences in the workplace from their pursuit of an argument that a coworker or supervisor acted incompetently." Nelson, 440 P.3d at 246.

Regardless of which rule we apply in this case, there is evidence of an actual conflict of interest resulting in prejudice to the Petitioner. Post-conviction counsel brought to the post-conviction court's attention multiple times that he felt there was a conflict of interest arising from his new position at the Public Defender's Office and that he should not represent the Petitioner in his post-conviction hearing. Post-conviction counsel's discomfort at having to question trial counsel was evident, to the point that he softened the wording of his questions to make clear that he was "going . . . through some of the claims" in the petition, not directly questioning trial counsel's performance. More importantly, post-conviction counsel did not meaningfully press trial counsel to admit any mistakes in his investigation, which was the focal point of the Petitioner's claims.

We note that post-conviction counsel's motion to withdraw in this court included counsel's stated belief that "in order to be an effective advocate for [the Petitioner], [post-conviction counsel] would have to attack the integrity of his own office." This court concluded on that occasion that a conflict of interest existed. The same conflict of interest that precluded counsel from representing the Petitioner on appeal existed before the post-conviction hearing, and the damage posed by the conflict had already occurred by the time counsel was allowed to withdraw. We conclude that the post-conviction court abused its discretion by summarily finding no conflict existed, which was against logic or reasoning given the untenable professional position into which post-conviction counsel was placed-- having to examine a senior attorney at his new office regarding his alleged deficiencies at trial. This type of personal conflict could not be cured by simply "building a wall" to preserve attorney-client confidentiality. Post-conviction counsel had an actual conflict of interest and should have been allowed to withdraw notwithstanding the proximity of the hearing date.

If a post-conviction court "knows or should know of conflicts of interest which might disqualify an attorney from participating in a post-conviction proceeding . . . the

trial court has a duty to either disqualify counsel with an actual conflict of interest" or ensure that the petitioner has knowingly and voluntarily waived the conflict by utilizing the following procedure:

> [The P]etitioner should (1) be brought into open court, (2) be given a full explanation on the record [of] how this matter would affect him; (3) be advised of his right to appointment of other counsel; (4) be questioned under oath by the parties and the post-conviction court to determine his understanding of this matter and waiver; and (5) state under oath whether he desires to waive any appearance of impropriety.
> . . . .
> Absent a proper waiver, the post-conviction court shall appoint other counsel.

Frazier, 303 S.W.3d at 679-84 (quoting Kevin Burns v. State, No. W2000-02871-CCA-R9-PD, 2001 WL 912817, at *7 (Tenn. Crim. App. Aug. 9, 2001)).[1] To waive a conflict of interest, a petitioner must demonstrate that he understands the nature and effect of the conflict and his right to the appointment of counsel if necessary and that he wishes to proceed with the continued representation of counsel of record notwithstanding the potential ill effects of doing so. Id. at 683 (citing McCullough v. State, 144 S.W.3d 382, 386 (Tenn. Crim. App. 2003)).

Although the dissent correctly notes that the moving party has the burden in the post-conviction court of showing an actual conflict of interest, see State v. White, 114 S.W.3d 469, 476 (Tenn. 2003), post-conviction counsel had already been instructed by the post-conviction court that his conflict of interest did not exist and that the court would not allow counsel to withdraw. The post-conviction court dictated the procedure in this case, and post-conviction counsel acquiesced to it. Although post-conviction counsel should have filed a written motion as part of his attempts to preserve the issue for the record, his failure to pursue the issue further did not absolve the post-conviction court of its responsibility under Frazier to investigate the conflict on the record and obtain a valid waiver from the Petitioner.

---

[1] In some limited cases, the Petitioner's statement under oath in a post-conviction petition waiving a conflict may be adequate. See Christopher Locke v. State, No. E2015-02027-CCA-R3-PC, 2017 WL 1416864, at *7 (Tenn. Crim. App. Apr. 19, 2017) (distinguishing the case from Frazier because the petitioner had verified in the post-conviction petition that he waived any conflict arising from trial counsel's working in the same office as post-conviction counsel; the conflict was imputed, rather than actual; and the post-conviction court dismissed the petition on procedural grounds without holding a hearing on the merits).

Because the post-conviction court did not follow the procedure prescribed by Frazier, we cannot say that the Petitioner knowingly and voluntarily waived the conflict. The post-conviction court stated that it had instructed counsel not to discuss the case with his new colleagues and that the court "fe[lt] comfortable that . . . [counsel could] represent [the Petitioner's] interest in this." The court then asked the Petitioner if he "underst[oo]d that" and "agree[d] with that." The Petitioner's affirmative answers only indicated his understanding that in the post-conviction court's opinion, no conflict existed. This did not constitute a "full explanation on the record [of] how this matter would affect him." Frazier, 303 S.W.3d at 683. Likewise, the Petitioner was not questioned under oath by the parties to determine his understanding of the conflict, and he did not state under oath that he wanted to waive the conflict. The post-conviction court did not follow proper procedure to ensure the Petitioner made a voluntary and knowing waiver of his right to conflict-free counsel.

Because post-conviction counsel had a conflict of interest that inured to the prejudice of the Petitioner, and the Petitioner did not effectively waive the conflict, we remand this case for the appointment of conflict-free counsel and a new post-conviction hearing.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we reverse the judgment of the post-conviction court and remand this case for the appointment of conflict-free counsel and a new post-conviction hearing.

_____

D. KELLY THOMAS, JR., JUDGE